KETCHIKAN CO. v. CITIZENS' CO.

(First Division. Juneau. August 24, 1903.)

No. 233a.

1. MINES AND MINERALS—STATUTES—WATER RIGHTS.

Section 2339, Rev. St. 1878, 14 Stat. 253 [U. S. Comp. St. 1901, p. 1437], concerning the vested rights to the use of water for mining; right of way for canals, etc., passed July 26, 1866, has not been put in force and is not in force in Alaska. This is not a part of the mining laws of the United States, but is an independent statute.

2. WATERS AND WATER COURSES—RIPARIAN RIGHTS.

Water rights in Alaska are restricted to what is known in common law as riparian rights. These depend upon the owner-

ship of the land which is contiguous to and borders upon the water, and they do not attach to any lands, however near, which do not extend to the water. The right of the riparian proprietor is undoubtedly to have the flow of the stream across his premises in its natural state; the water being undiminished by being diverted for any purpose.

[Ed. Note.—For cases in point, see vol. 48, Cent. Dig. Waters and Water Courses, § 27.]

### 3. SAME—APPROPRIATION.

Merely taking water from a stream is not an appropriation of the water. To make an appropriation one must not only take it from the stream, but must apply it to some beneficial use. To the extent of the use there is an appropriation.

[Ed. Note.—For cases in point, see vol. 48, Cent. Dig. Waters and Water Courses, § 7.]

### 4. MUNICIPAL CORPORATIONS—TOWNS.

Municipal corporations may exercise only the powers directly granted and those necessarily implied and those indispensable to the proper purposes of the corporation.

[Ed. Note.—For cases in point, see vol. 36, Cent. Dig. Municipal Corporations, § 149.]

The plaintiff corporation filed its bill of complaint in this case on June 6, 1903, wherein it is alleged, in addition to facts showing an interference with the water rights of the plaintiff company and the building of the dam, etc., that endangered the existence of its plant, that an emergency existed for the granting of the preliminary injunction pending a suit, owing to the work upon the dam, which it was alleged was rapidly being pushed to completion, and if completed would result in great and irreparable damage and the destruction of their property. This allegation of emergency and the necessity of issuing an immediate order of injunction is in accordance with the statute upon this question, and the restraining order—the temporary injunction—was issued in accordance with the showing made and the prayer of the complaint. The injunction order was served and returned by the marshal and filed June 24, 1903.

Thereafter, on the 29th day of June, the defendant company served their notice of motion to dissolve the temporary injunction, and fixed the time of bringing such motion before the court as the 6th day of July, 1903. On the same day (June 29th) the defendant company filed what it termed its "answer and cross-complaint," and on the 6th day of July appeared in court to urge their motion to dissolve. Whereupon the plaintiff filed a motion attacking the answer and cross-complaint, and on leave granted the defendant withdrew their answer, and, making some changes, filed the same as an amended answer. It being apparent that the parties were not ready for a hearing, and it further appearing that one of the attorneys for the defendant, Arthur K. Delaney, had urgent business on the Atlantic coast and could not be present, had the hearing delayed for some days. The hearing of the case was finally set by agreement of all parties for August 10, 1903. In the meantime the plaintiffs filed their amended bill of complaint on July 6th, and their reply to defendant's amended answer on the 23d of July. On the 10th day of August, when the case came up for hearing, the judge of this division of the district, having at one time had some interest in the plant afterwards conveyed to the plaintiffs in this action, and it having been rumored that there might be some objection to the judge of this division hearing the case, he refused to proceed further with the hearing unless all parties to the suit should file a stipulation in writing requesting him to proceed with the hearing. Such stipulation and request having been filed, the judge of the court consented to take up the hearing because of the great delay that would occur in calling in another judge, and because of the anxiety of the parties in interest for an early and speedy hearing. The case was therefore proceeded with, and the evidence presented in the form of affidavits and oral testimony; and after the hearing and arguments of counsel, lasting for nearly a week, the case was submitted to the court on the mo-

tion to dissolve the temporary injunction, the files, affidavits, and evidence produced before the court.

Malony & Cobb and W. E. Crews, for plaintiff.

A. K. Delaney and Charles E. Ingersoll, for defendant.

BROWN, District Judge.  Several questions arise on the face of the pleadings in this case, most all of which have been determined by abundant authority.  It may be said, and it is probably true, that section 2339 of the Revised Statutes of the United States (1878), concerning the vested rights to the use of water for mining, right of way for canals, etc., passed July 26, 1866, has not been put in force and is not in force in Alaska.  This is not a part of the mining laws of the United States, but is an independent statute.  Chapter 262, § 9, 14 Stat. 253 [U. S. Comp. St. 1901, p. 1437].  The terms of this statute are in part as follows:

"Whenever, by priority of possession, rights to the use of water for mining, agriculture, manufacturing, or other purposes have vested and accrued, and the same are recognized and acknowledged by the local customs, laws, and the decisions of the courts, the possessors and owners of such vested rights shall be maintained and protected in the same."

Right of way for ditches and canals is also given by the same section.

This statute not being in force in Alaska, and no rights whatsoever given by the statute for the appropriation of water upon the public domain, the questions arise as to what, if any, right whatsoever a party may obtain by the appropriation and use of water for mechanical and other purposes.

By a provision of our Code enacted by the Congress of the United States, the common law, where not inapplicable and not inconsistent with the Constitution of the United States or with any law passed or to be passed by Congress, is adopted and declared to be the law within the district of Alaska.  Section 367, p. 432, Carter's Code.  Possibly the rights in water, therefore, and the use of the same is restricted to what is

known in the common law as "riparian rights." These depend upon the ownership of the land which is contiguous to and borders upon the water, and they do not attach to any lands, however near, which do not extend to the water. It is said "that the rights of a riparian proprietor, so far as they relate to any natural stream, exist jure naturæ, because his land has by nature the advantage of being washed by the stream." The right of the riparian proprietor is undoubtedly to have the flow of the stream across his premises in its natural state; the water being undiminished by being diverted for any purpose.

In this case it does not seem to be of very much importance what the theory of the law is as to the rights of parties to the use of the water, whether it be as a riparian owner or as an appropriator who has reduced the water to possession, and appropriated it to a useful and beneficial purpose, as long as the water should be returned to the bed of the stream in undiminished quantities before it should reach the lands of another riparian proprietor. Such proprietor would have no ground for complaint under such circumstances.

It is undisputed that the plaintiff company was the elder appropriator of the waters of the creek; that as such it has the undisputed right to all the water flowing in the creek at the time they made their appropriation, and to the amount that was originally claimed and applied to beneficial use. It would seem that the capacity of the plaintiff's flume determines the amount of water necessary for its use, and this by actual measurement appears to be very much greater than the amount of water flowing in the creek at the time the measurement was made in the month of July last. That the plaintiff is entitled to this amount of water less such small quantity, if any, as had been appropriated by others prior to the time the appropriation was made by the plaintiffs, uninterfered with by any other person or persons or corporations, there can be no doubt. But, as before stated, if others should make appropriation of water

for mechanical uses at a point above them, and return the same to the creek above the intake of the plaintiff company, so that the same should have been undiminished in quantity by such use, such persons or company unquestionably may take such appropriation without injury to the party plaintiff, and unless they are injured they cannot complain.

It is alleged on the part of the defendant that the defendant has a prior appropriation for a very considerable quantity of water, and illustrates their claim by showing the location of a small ram, which forces water from a point about where the plaintiff's intake begins up the side hill a considerable distance to the residences of two families, and it is shown that the two families have made use of this water or some portion of it, forced up through a small pipe by the ram. They further claim that a six-inch pipe had been put into the stream from the bank at a point above the plaintiff's intake; that the six-inch pipe was shortly reduced to a two-inch, and the two-inch pipe run to the wharf. It appears that this pipe would be capable of running a very considerable amount of water to the wharf where the same ends. It must be understood, however, that merely taking the water from a stream is not an appropriation of the water. To make an appropriation one must not only take it from the stream, but must apply it to some beneficial use. To the extent of the use made there is an appropriation. Whatever rights the defendant has through these two pipes that he refers to are admittedly prior in point of time to the taking of water by the plaintiff company. It will be necessary, then, to inquire the extent of the appropriation made, or, in other words, the extent to which the water taken has been applied to a beneficial use, unless the riparian rights of the plaintiff prevent. As to the water propelled by the ram through the small pipe, two families have used it. Allow the largest quantity (to wit, 100 gallons a day to each family) that could be reasonably used by them for domestic purposes, and

we have 200 gallons per day that is forced through the small pipe, constituting the actual use to which that water is applied, and therefore limits the appropriation thereby to the amount necessarily and properly used.

Considering the other pipe, and what does the evidence show? That there were two points down in the town where there was a small hydrant from which people occasionally drew water for use. How much or to what extent this was used does not appear. It was shown that the 2-inch pipe under a 24-foot pressure would deliver into the tank that is situated on the wharf perhaps something like 12,000 gallons per 24 hours, but no evidence is furnished to show that the water in the tank was applied to any use whatever. It is sufficient to say, however, that the evidence shows that at the point of delivery from the pipe into the tank there is not the pressure described, and therefore the estimate made is practically valueless; but there is no offer to show what is done with the water, if anything, after it is put into the tank. The defendant alleges an appropriation of 1,000 gallons or more per day, but makes no proof of such appropriation, except to say that this amount passes through the pipe. The defendant alleges that the object and purpose of taking the water, other than such as may be used to run their electric plant, is to supply the citizens of the town of Ketchikan with water for domestic purposes and to provide water for fire protection. I think it appears from the testimony of Mr. Jenkins (and his testimony is extolled by the defendant's attorney as being truthful, and I accept it as such) that the plaintiff company for about nine months in the year used practically all the water of Ketchikan creek, except as above stated, what was being used through the two pipes referred to. Nothing more than was being actually used through these pipes and applied to a beneficial purpose at the time the plaintiffs claimed their water right and actually took the water from the creek, can they have or claim during these

months referred to by Mr. Jenkins. What the defendants were using at the time the plaintiffs took their water settles the quantity of water to which they have a prior appropriation. It is not clear just how much that was from the testimony, but it is quite clear it could only have been a very small quantity.

I now come to the complaint made by the complainant or the plaintiffs as to the insecure character of the dam the defendants are constructing, and the menace that damming the stream brings to their property. The testimony of the two engineers who examined the dam and testified in this case (Mr. Williams and Mr. Denby) clearly shows its insecure character, and if allowed to be built and the water impounded it would become clearly a menace to the property of the plaintiff.

Prior to the testimony given by these witnesses I have been of the opinion, from what personal knowledge I had of the creek, that it would be impossible to build a secure dam in the creek without such a large expenditure of money as would render such a structure practically impossible; but the testimony of these two gentlemen has convinced me that such a dam can be constructed without a very large expenditure of money, and can be made reasonably secure for a time, and until the timber used shall become rotten by age—probably for some years; that even the dam now being constructed might be made secure, but Mr. Williams, who is one of the most accomplished and experienced engineers in this country, says it would be cheaper to build the structure anew than it would to undertake to make the old structure safe; but that a dam constructed on somewhat the lines of the one that the defendant company was putting in can be built at the point where they have undertaken it, and can be made safe, or reasonably so, seems to be quite certain. If this was done—if a proper dam was constructed and the water impounded—as the defendant company proposes, they would be entitled to use the same, turning it back into the

creek before it reached the intake of the plaintiff company; but for nine months in the year, or thereabouts, none of the water, beyond the small amount before referred to, could be taken from the creek by the defendant company. For the present, then, the motion of the defendant company to set aside the injunctional order must be denied.

Some other questions have been presented in the course of the arguments as to the granting of the use of the streets of Ketchikan by ordinance to the plaintiff company and afterwards the repeal of the ordinance. Ordinance No. 17 has been offered in evidence, but no ordinance presented repealing that ordinance. A second ordinance has been offered in evidence, practically giving the defendant company the same right to use the streets of Ketchikan as was given to the plaintiff by the ordinance No. 17, except in this: that the later ordinance does not undertake to give the defendant company exclusive rights, while the former purports to give the plaintiff company exclusive rights.

I am not disposed just now to give this question very much consideration. It is the law, undoubtedly, that a state Legislature may grant exclusive rights to occupy certain portions of certain streets for the purpose of putting down pipes for gas or for putting poles up upon which electric wires may be strung or hung, and for putting pipes down for the conduct of water that may be used for fire and domestic purposes; and a city may do what the state could do, or the city council may by its action do what the state could do, if the state had granted such exclusive right and such power and authority to the city and the city council, and it would seem that under conditions such as exist here the Congress of the United States might grant like rights and privileges, and might vest in municipal corporations like powers. The question that might under some circumstances be of peculiar interest in this case is: Has

Congress vested in the various corporations that may be created under the general law or general act of Congress power to grant this exclusive right? Among the powers enumerated by the act of Congress that may be exercised by incorporated towns we find the following: "By ordinance to provide for necessary street improvements, fire protection, water supply, lights, wharfage, sewerage, maintenance of public schools, protection of public health, police protection to the extent of assessment and collection of taxes." So much of this subdivision of the act of Congress as is of importance in the case at bar is found in the words, "to provide for fire protection, water supply, lights." Is this language broad enough to assume, under the circumstances under which this authority is granted, that it was the intention of Congress to give corporations created under this statute the somewhat unusual power of granting exclusive privileges?

In the case of Grand Rapids E. L. & P. Co. v. Grand Rapids E. E. L. & F. G. Co. et al. (C. C.) 33 Fed. 659, it appears that the authority given to the city council was to regulate the lighting of the streets and alleys, and also the general care of the streets, lighting public lamps, and their erection, supervision of the streets, highways, etc., and the repairing, cleaning, and altering of the same. The words "to provide for necessary street improvements, fire protection, water supply, and lights" is a broader and more comprehensive grant of power than that contained in the charter of Grand Rapids. It is said that corporations may exercise only the powers directly granted, those necessarily implied, and those indispensable to the proper purposes of the corporation.

In the case of Walla Walla v. Walla Walla Water Co., 172 U. S. 1, 19 Sup. Ct. 77, 43 L. Ed. 341, the city by its ordinance entered into a contract with the water company to furnish gas and water to the municipality through pipes and mains

2 A.R.—9

laid in the streets.   Referring to this ordinance, Mr. Justice Brown, who delivered the opinion, says:

"It is sufficient for the purposes of this case to say that this court has too often decided for the rule to be now questioned that the grant of a right to supply gas or water to a municipality and its inhabitants through the pipes and mains laid in the streets, upon condition of the performance of its service by the grantee, is a grant of a franchise vested in the state in consideration of the performance of a public service, and, after performance by the grantee, is a contract protected by the Constitution of the United States against the state Legislature to impair it.   It is true that in this case the franchise was granted directly by the state Legislature, but it is equally clear that such franchise may be vested upon corporations by the municipal authorities, provided the right to do so is given by their charters. State Legislatures may not only exercise their sovereignty directly, but may delegate such portions of it to inferior legislative bodies as in their judgment is desirable for local purposes."

The city of Walla Walla provided by its ordinance that the Walla Walla Water Company should furnish water for a period of 25 years, for which the city was to pay $1,500 per annum.   It was provided that the water company should furnish water for domestic purposes, including the sprinkling of lawns, for a period of 25 years, and it was further provided that until such contract shall have been avoided the city of Walla Walla shall not erect, maintain, or become in any way interested in any waterworks except the ones herein referred to, save as hereinafter specified.

It is said that the water company accepted the ordinance, substantially complied with its terms and conditions, and that the contract had never been avoided by the city or the courts, and was still in force when the bill was filed.   After the said contract had been in force for about six years the city passed an ordinance to provide for the construction of a system of waterworks for the purpose of supplying the city and its inhabitants with water, to authorize the purchase and condemnation of land for that purpose, and the issue of bonds to the amount of $160,000.   The city of Walla Walla was not author-

ized to grant exclusive rights, and no attempt was made to do so by its ordinance. In this case it was held that the city had no right to establish waterworks while the contract to supply water under this ordinance was in force and effect.

It has occurred to me that the ordinance No. 17, while purporting upon its face to give exclusive rights, and if it had not power to do so, could be construed as a contract between the plaintiff and the city not to procure lights or water from any other persons during the period of the years named in the ordinance. It has also occurred to me that where Congress has granted to a territorial Legislature the right to legislate upon all rightful subjects, and it being held under this grant of power that a territorial Legislature could grant exclusive rights, that possibly the grant of power to the towns in Alaska would also be so construed. But I only refer to this matter in a speculative way, and not as passing upon the merits of the question, nor do I pass directly upon the limit of power granted to the corporation by the Congress of the United States. Under the present conditions of this case, I do not feel that the court is required to pass upon that question. It is sufficient that the dam is not properly constructed, and that the impounding of the water would be a menace to the property of the plaintiff corporation; that the taking of water during those months of the year when the whole flow is insufficient to supply the plaintiff company with its requisite power, beyond the amount it had been actually taking and applying to beneficial use prior to the accruing of the rights of the plaintiff, is a wrong to the plaintiff, and an act that would deprive the plaintiff of a vested right, and one that a court of equity is bound to restrain.

The temporary restraining order is therefore continued in force and effect to the extent indicated in this opinion.