### RODGERS v. PITT et al.

#### (Circuit Court, D. Nevada. April 4, 1904.)

#### No. 658.

1. WATER RIGHTS—SUIT TO ENJOIN DIVERSION OF WATER—PARTIES.

A number of owners in common of a dam flume and irrigating ditch, who by agreement divide the waters flowing in the ditch between them, are tenants in common of the water rights, and one may alone maintain a suit to enjoin the diversion by a subsequent appropriator of any por- tion of the water to which he or either of his co-tenants is entitled.

2. RES JUDICATA—INTERLOCUTORY DECREE—QUESTIONS REVIEWABLE ON FI- NAL HEARING.

All questions decided on a motion for a preliminary injunction are open for review on the final hearing, but the prior decision should be adhered to unless additional facts appear which require its modification or reversal, or it clearly appears that an error was committed.

3. WATER RIGHTS—APPROPRIATION OF WATER—EXTENT OF RIGHT ACQUIRED.

To establish an appropriation of water from a stream, the proof must show an intent to apply it to a beneficial use existing at the time, an actual diversion from the stream, and the application of it to such bene- ficial use; but the right is not limited to the amount of water used at the time the appropriation is made, but extends to such other and further amount within the capacity of the appropriator's ditch as may be re- quired for the future improvement and extended cultivation of his lands for which the appropriation was made, his intention, and the object and purpose for which it was made, and his acts in carrying out such pur- pose, being taken into consideration.

4. SAME—DILIGENCE IN APPLYING TO BENEFICIAL USE.

To entitle an appropriator of water to claim his rights therein by re- lation to the time when the appropriation was made, he must have pros-

---

¶ 2. See Injunction, vol. 27, Cent. Dig. § 341.

ecuted the work necessary to apply it to the beneficial use intended with reasonable diligence; what constitutes such diligence being a matter depending on the facts in each particular case.

5. SAME—PREPARING LAND FOR IRRIGATION.

The fact that, at the time a complainant made an appropriation of water from a stream for irrigating purposes, the land intended to be irrigated was swamp and unfit for cultivation, does not affect his right to the water appropriated, as against a defendant whose appropriation was not made until complainant had drained his land, put it in cultivation, and applied the water to its irrigation.

6. SAME.

An appropriator of water from a stream for irrigating purposes is not confined to the amount of water he used, or to the amount of land he irrigated during certain dry seasons when there was not sufficient water to irrigate all his land or as much as he had previously irrigated.

7. SAME—BENEFICIAL USE—IRRIGATION OF WILD HAY LAND.

The use of water to irrigate wild grass land for the purpose of producing hay or pasturage is a beneficial one, and one who, year after year, conducts water from a stream onto his land for such purpose in such quantity as to be effective, thereby acquires the right to the use of sufficient water to irrigate such land.

8. SAME—MANNER OF USE—CUSTOM.

In determining the amount of water which a user applies to a beneficial use, and to which he is entitled as against a subsequent appropriator, the system of irrigation in common use in the locality, if reasonable and proper under existing conditions, is to be taken as the standard, although a more economical method might be adopted.

In Equity. Suit to enjoin the diversion of water from a stream. On final hearing.

Since the submission of this cause the original complainant, Arthur Rodgers, died, and the suit has been revived in favor of the executrix of his will, but the references will be made to the original parties to the suit.

There is no case made out against the defendant the Lovelock Mill Company, and it should be dismissed from the case.

The lands of the defendants are situated in the upper part of Lovelock Valley; the lands of complainant, Rodgers, and of Thies and Carpenter, are situated in the lower part of the valley.

There is a long history connected with the rights of the predecessors in interest of the complainant to the land and water obtained by them prior to the time when defendants acquired their rights to the waters of the Humboldt river. Hundreds of pages of typewritten testimony give the facts in relation thereto. It would serve no useful purpose to enter into any minute detail of the facts as shown by the undisputed testimony. Suffice it to say, that in 1875 P. N. Marker commenced purchasing land in Lovelock Valley. At this time there were several irrigating ditches in use on other lands owned by other parties. These lands and the water rights appurtenant thereto were acquired by the Markers, and all the lands described in the complainant's bill in this case were owned by them before the fall of 1888. In addition to the various ditches above mentioned, two new appropriations of water were made in 1875, viz., The Farmers' ditch and the Markers' ditch, claiming 15,000 inches of the water flowing in the Humboldt river, and the work on these ditches was prosecuted with reasonable diligence. When the Markers first acquired their rights to the land, most of the land was covered here and there with sloughs, with the natural water flowing in the Humboldt river. At the time the Markers went upon the land no grain or alfalfa was raised in Lovelock Valley. The irrigation was principally used upon wild land for pasturage and for hay, that the natural grasses could be made to produce. There was no scarcity of water for irrigation on the Markers' lands prior to the time of defendants' appropriation of the surplus waters. The flume in the Marker ditch, upon which much testimony was

given on both sides, would at that time carry all the water that the Marker ditch could bring to it, and the ditches below the flume were of sufficient size and capacity to carry all the water which the Marker ditch above the flume diverted from the river.

There is more or less conflict in the testimony of the witnesses, and a decided controversy in the briefs of the respective counsel, as to the capacity of the Marker ditch and flume. L. H. Taylor, a civil engineer, introduced by the defendants, testified that the carrying capacity of the ditch in 1898 was a little less than 7,000 miner's inches, and that the capacity of the flume was established by him at that time to be 11,500 inches, and that the flume actually showed a high-water mark of 7,175 inches. In 1901 he estimated the capacity of the ditch, before the banks were raised, to be 5,310 inches. Thurtell, the expert on behalf of complainant, testified that 9,000 inches would be a conservative estimate of the capacity of the ditch, and that the capacity of the flume when filled to a depth of three feet, with a free discharge, is about 12,000 inches. In making their measurements Taylor and Thurtell used the same coefficient of friction, and each took into consideration, in his estimates of the capacity of the ditch, "the willows growing along the ditch." The measurements of these experts were not based on the conditions existing at the time of trial. Thurtell, upon his cross-examination, said: "The carrying capacity of that ditch is based, not upon the carrying capacity of the ditch at present, but as it was within its old banks before the levee was thrown up. * * * My estimate was based on what the ditch would carry before it was leveed up."

There was as much land irrigated on the complainant's lands prior to 1888 as has been irrigated since, but not as much land cultivated for crops of grain and alfalfa; more land being used and cultivated in the earlier years for pasture and grass, and less for crops, than in the later years. At the time this suit was brought, in 1898, the amount of land cultivated in grain and alfalfa on complainant's land was 2,127 acres, on the Carpenter land 976 acres, and on the Thies land 544 acres, making a total of 3,647 acres.

In 1896 over 1,200 acres were cultivated in grain and alfalfa upon complainant's land, and 800 acres additional were plowed, but not sown on account of lack of water. In 1897 about 1,600 acres were in grain and alfalfa, in addition to 250 acres of plowed ground. In 1898, the year in which the present suit was commenced, there were 2,100 acres in cultivation, and there were also 1,250 acres of plowed land, part of which was sown, but on which no crops were produced, again because of the want of water.

Thies, Carpenter, and Rodgers own separate tracts of land in Lovelock Valley. Long prior to 1883 the owners of these separate tracts of land had acquired separate rights in various ditches and sloughs, for the purpose of conveying water to irrigate such portions of their lands as could be cultivated, etc. In 1883 they united together for the purpose of obtaining the water necessary to irrigate their respective lands from a common source. To this end they constructed the Marker dam, flume, and ditch, and by means thereof diverted the waters of the Humboldt river to and upon their lands for irrigating purposes. The interests of the owners of these respective tracts of land in the ditch and water flowing therein were, by agreement of the parties, divided as follows: Thies is entitled to 3/24, Carpenter to 7/24, and Rodgers to 14/24. Rodgers brought this suit to enjoin defendants, who are subsequent appropriators of the water from the river, from diverting any of the water which Rodgers, Thies, and Carpenter are entitled to have flow through the Marker ditch for the purpose of irrigating their respective lands.

Complainant is the owner of the lands described in his bill, and of all the water rights of the Markers connected with said lands. About 10,000 acres of said land is so situated that it is capable of being irrigated by the water flowing through the Marker ditch. According to the testimony offered by defendants, more than 4,000 acres of the complainant's lands which were covered by sloughs, tules, and swamps in 1875 had ceased to be such in 1888, when the defendants commenced work to divert the waters of the river. There was a small portion of the land that was overflowed during a period of unusual high water in the year 1890. There is a great diversity of opinion in the testimony as to the actual number of acres that were irrigated

prior to 1888. P. N. Marker placed it at 4,000 acres, others much less, and some of the defendants' witnesses placed it at about 1,000 acres. Carpenter irrigated about 1,200 acres, and Thies about 700 acres.

In the fall of 1888 the defendants Pitt and Hauskins commenced work under their appropriation of water, to be conveyed under the Old Channel ditch, for the purpose of irrigating their lands, and completed the same in 1889. They then had between two and three thousand acres of land. In 1898 there was a freshet which washed away their dam. It was rebuilt, and in 1891 and 1892 about 1,200 acres lying under the ditch were put in crops. Thereafter the acreage of land irrigated was gradually increased. The largest increase was made in 1893 and 1895, and the defendants have now under irrigation about 4,000 acres of land.

In 1892 the Markers and Thies commenced an action in the state court against Pitt, Hauskins, and Downs to restrain the defendants therein from diverting 404 cubic feet per second of the waters of the river.

The various contentions of counsel for defendants, as stated in the brief, are as follows:

"Under the testimony, and the law of appropriation, we shall, under various headings, contend:

"(1) That Rodgers, Carpenter, and Thies are not, and never were, tenants in common of the water flowing through the Marker ditch, and that, even if they were, a co-tenant can only sue to protect his own interest in the water.

"(2) The holding of the court that they were tenants in common was not intended to preclude further investigation and final determination. The principle of res judicata does not apply. The whole of the subject matter is sub judice.

"(3) For the same reason it is immaterial that the court adopted the system of irrigation in use in Lovelock Valley for the purposes of the hearing upon the temporary restraining order. The right to water is usufructuary and not proprietary, and is subject to the control and regulation of the court.

"(4) That the maximum capacity of the Marker ditch, determined at the point of its least carrying capacity, was never greater than 5,310 inches, until enlarged somewhat in 1901. The discharge capacity of the flume is reduced to about 5,000 inches by obstructions below.

"(5) That what is now the Marker ditch was the main channel of the river in 1875. It was a succession of sloughs, connected in order to drain the lands. The sloughs and ditches were all for drainage purposes, excepting a small 'Farmers'' ditch. The great necessity then was to drain and keep the water away from the land. When Pitt and Hauskins appropriated, the Marker ranch had only a thousand acres under cultivation. The remainder was: 6,000 acres of swamp, tule, and cane; 3,000 acres of sagebrush, greasewood, etc.; and about 2,000 acres of barren land above the ditch.

"(6) To establish an appropriation of water, the proof must show: (1) An intent to apply it to a beneficial purpose; (2) a diversion from the stream to apply it to the beneficial purpose; (3) an actual application of it to the beneficial use.

"(7) The intent and diversion must be followed by the actual application within a reasonable time, or there is no appropriation—the prosecution of the enterprise must be regarded as abandoned.

"(8) If there is any delay in applying the water to a useful purpose, it must be attributable to matters incident to the enterprise itself, or the doctrine of relation cannot be invoked. Illness and poverty are not legal excuses.

"(9) T. J. Hauskins' appropriation antedated that of Marker, and, if lack of diligence in prosecuting the enterprise to completion may be excused by poverty, his appropriation is prior to that of Marker.

"(10) Marker only put under irrigation 1,000 acres in 14 years—from 1875 to 1889—and his right to increase the use of water, assuming that he was the first appropriator, ended when Pitt and Hauskins appropriated in 1888.

"(11) Assuming that Marker was prior in time, all of the residue of the

stream in 1888 was subject to appropriation, and Pitt and Hauskins acquired a vested right to such residue by their appropriation.

"(12) A claimant's right is not measured by the capacity of his ditch, nor by the quantity of water he diverts, but by the amount he needs, when economically used, for beneficial purposes. Beneficial use is the payment demanded by the law, and when payment ceases the right is suspended. The experiments made, the experience of the ranchers, and the tables prepared from the testimony of the witnesses absolutely and mathematically demonstrate that less than one-fourth of an inch to the acre during the irrigating season is ample to insure the best irrigation and crops on complainant's land and throughout the valley.

"(13) The complainant's right to irrigate begins April 1st and ends October 1st, and the defendants, by their intent, diversion, and use of the water, are entitled to a prior right to the water prior to April 1st.

"(14) While the court, having the authority to limit the use of water to the amount necessary to accomplish the purpose of the appropriation, has the correlative power to decree a sufficient head, by rotation or otherwise, it need not be exercised in this case, because the defendants have admitted that the equivalent of a constant flow of 250 inches for six months measures the complainant's rights, and consented that 84,487,500 cubic [feet] may be called for whenever required—enough to cover 1,000 acres two feet deep in any number of irrigations desired.

"(15) The case against the Lovelock Mill Company failed utterly, and it must be dismissed from the case."

Charles W. Slack and A. E. Cheney, for complainant.

Bigelow & Dorsey, R. M. F. Soto, and Torreyson & Summerfield, for defendants.

HAWLEY, District Judge (after stating the facts as above). This is a suit in equity to enjoin the diversion of water by defendants from the Humboldt river. It has frequently been before the courts, and four different opinions have been rendered therein. Rodgers v. Pitt (C. C.) 89 Fed. 420; (C. C.) 89 Fed. 424; (C. C.) 96 Fed. 668; (C. C. A.) 104 Fed. 387. It is now before the court upon the evidence taken under issue joined at the trial. The general facts in relation thereto are set forth in the foregoing statement, some of which were stated in the opinion of this court (89 Fed. 420), ordering the issuance of a temporary injunction, to which reference is here made.

A careful, extended, and painstaking examination and consideration of the briefs of the respective counsel, and the material portions of all the testimony, has convinced me that the points made and relied upon at the trial are substantially the same as at the preliminary hearing. The testimony at the trial was more thorough in its details as to the facts, and the arguments more extended, with a citation of authorities showing commendable industry, care, and zeal on the part of the respective counsel; but the general history of the case remains the same, with one or two minor exceptions, which will hereafter be noticed. Did the court err in any of the conclusions reached at the preliminary hearing? Do the merits of the case, as presented at the trial, demand any different conclusion than was then reached? These are the real questions to be now determined.

1. Can complainant maintain this suit and obtain an injunction against the defendants, except as to the amount of water appropriated, needed, and required for a beneficial use for the irrigation of his own lands? It is apparent from the facts of this case that Thies, Car-

penter, and Rodgers, by virtue of their interest in the Marker dam and ditch, might at any time agree among themselves that, instead of using their proportionate share of the waters flowing therein all the time on their land, each should take all the water a part of the time. As was said in 89 Fed. 420:

"They could agree that Thies should have all the water for 3 days out of 24, that Carpenter should have it all for 7 days out of 24, and that Rodgers should take it all for 14 days out of 24. In the event of any litigation between themselves as to their respective rights, a court of equity would have the unquestioned power to make such a decree, if it fairly represented their respective rights as to the use and necessity of the water to irrigate their respective lands. This being true, it follows that each has such a unity of possession of the ditch and water flowing therein as to entitle either of them to bring suit, and enjoin any diversion of the water, by a trespasser, to which they are all entitled."

This court will not consider any of the questions decided on the hearing for a preliminary injunction as res judicata. They are open for review, but they should be adhered to, unless it clearly appears that an error was committed, or that additional facts were brought out at the trial which demand a modification or reversal of the views expressed at the preliminary hearing. Upon this point no new facts were elicited at the trial. The conclusions reached in the former opinion are in accordance with the views expressed by this court in Union Mill & Mining Co. v. Dangberg (C. C.) 81 Fed. 73, 87, and followed in Miller & Lux v. Rickey (C. C.) 127 Fed. 573, 586. In addition to the authorities cited in the opinions referred to, upon this point, see: The Debris Case (C. C.) 16 Fed. 25, 34; Carpentier v. Webster, 27 Cal. 524; Himes v. Johnson, 61 Cal. 259; Meagher v. Hardenbrook, 11 Mont. 385, 390, 28 Pac. 451; Spanish Fork v. Hopper, 7 Utah, 235, 238, 26 Pac. 293; Hall v. Blackman (Idaho) 68 Pac. 19, 22; Bates v. District of Columbia, 7 Mackey, 75, 79; Black's Pomeroy on Water Rights, § 63; Long on Irrigation, § 85.

In Black's Pomeroy, supra, the author said:

"Wherever ditches or other structures for diverting and appropriating water belong to two or more proprietors, such owners are, in the absence of special agreements to the contrary, tenants in common of the ditch, and of the water rights connected therewith, and their proprietary rights are governed by the rules of law regulating tenancy in common. * * * Of tenants in common, each has a right to enter upon and occupy the whole of the common property, and every part thereof, and may recover the whole thereof from a trespasser; and an arrangement as to periods for the use of the water, among the co-tenants, affects them only, and is for their convenience, and is no defense to an action of trespass against a third party by one of the co-tenants."

In Meagher v. Hardenbrook, supra, the court said:

"That one tenant in common may preserve the entire estate or right held in common is a proposition so well settled it is unnecessary to cite authorities in support thereof. In this the tenant in common is only preserving his own, as his right partakes of the whole."

2. Touching the matter of jurisdiction discussed by the Circuit Court of Appeals in 104 Fed. 387, 390, some reference ought, perhaps, to be made to the averments in defendants' answer, alleging that the complainant had actual notice at the time he took the conveyance from

the Markers of the pendency of the action in the state court. The defendants introduced but one witness to sustain this special defense, and his testimony failed to meet the expectations of defendants in that respect. Notwithstanding this fact, counsel seem to think that the court ought to take judicial notice that complainant must have known the facts to be as alleged in the answer. It is enough to say upon this point that there is no testimony in the record tending to show that at or prior to the time of the commencement of this suit complainant had actual notice of the pendency of the action in the state court. If there had been any constructive or actual notice proven, then the court might have been called upon to answer the question, suggested by complainant's counsel, whether or not the jurisdiction, being matter of abatement, should have been raised by plea, and is waived by answering to the merits. It has been so held in many cases. Marshall v. Otto (C. C.) 59 Fed. 249, and authorities there cited. In addition thereto, see Dodge v. Perkins, 4 Mason, 435, Fed. Cas. No. 3,954; Wood v. Mann, 1 Sumn. 578, Fed. Cas. No. 17,952; 1 Bates on Fed. Proc. § 239; 1 Beach, Mod. Eq. Pr. § 304.

3. It is claimed by defendants that complainant's right to use the water commences April 1st, and ends on October 1st, each year, and that in any event the defendants should not be enjoined from using the water prior to April 1st. There is no doubt that, where a party in the appropriation of water limits himself in using it to certain specified dates, subsequent appropriators may acquire a vested right to the water to be used at times not embraced in the claim of the first appropriator. In Barnes v. Sabron, 10 Nev. 217, 245, the court said:

"We think the rule is well settled, upon reason and authority, that, if the first appropriator only appropriates a part of the waters of a stream for a certain period of time, any other person or persons may not only appropriate a part or the whole of the residue, and acquire a right thereto as perfect as the first appropriator, but may also acquire a right to the quantity of water used by the first appropriator at such times as not needed or used by him. In other words, if plaintiff only appropriated the water during certain days in the week, or during a certain number of days in a month, then the defendants would be entitled to its use in the other days of the week, or the other days in the month."

But the contention of counsel must be disposed of by the particular facts existing in this case. The record shows that the complainant claimed and used the waters appropriated by his predecessors in interest for the irrigation of the land owned by him. His claim and use of the water was not with reference to any particular period in the spring or fall, or during any particular months in the year. It is broadly claimed that complainant never irrigated any of his land any year before April 1st. This is not borne out even upon the testimony of H. C. Marker, offered by defendants:

"Q. What time did the irrigating season begin up to 1888 and 1889? When did you first begin to irrigate? A. What time of year? Q. Before 1889. A. About the 1st of March. Q. You began irrigating as early as the 1st of March? A. Yes. Q. Do you know of any irrigating that began as early as that time? A. Yes, I have irrigated in January. Q. What did you irrigate? A. Alfalfa. * * * Q. I asked you yesterday something about the time of the beginning of the irrigating season; you answered that; and now

I would like to recur to that subject and ask you when it was that you first began to irrigate while you were on the Marker ranch from 1875 until 1889 —what month in the year? A. Generally commenced the 1st of April on grass ground. Q. Have you ever irrigated earlier than that? * * * A. Last year I turned water in on fruit trees, and to kill gophers, and some on alfalfa too, for three or four days. In January. * * * Q. Have you irrigated in March sometimes? A. It may be, but I do not think of it. Q. * * * I want to know whether that answer of yours fits all the time there, that your earliest irrigating season began in April, while you were on the Marker ranch? A. I think so; I can't say that for certain."

The truth is, as shown by the testimony, that there was no fixed time to begin irrigating in Lovelock Valley. It depended upon the seasons, climatic conditions, water supply, etc., as well as upon the character of the soil. In a season like the present, where there has been an almost continuous fall of rain or snow during the entire month of March, it is safe to say that no irrigation will be required before the 1st of April, and, in many localities, probably not before the 1st of May. In dry seasons it would be required much earlier.

Nelson, a farmer residing in the valley, said:

"Q. Is the season in the year for irrigating always the same? The same one year as in another? I am speaking, of course, of the land that you have described, Rodgers', Thies', and Carpenter's, and your own and your neighbors' land lying under the Union Canal? A. The season varies considerably. Q. There is no fixed time then at which you begin irrigation? A. No. Q. If the season is an open, one and water is short, what time would you begin? A. I would begin about the first part of March for alfalfa. * * * It might damage grain to begin too early. Q. But if, on the other hand, if the season is a late one, could you make profitable use of water at an earlier period? A. If the season is late, with the prospect of abundance of water, we have better results irrigating in April. Q. On the other hand, if the season was late, and the prospect not good for an abundance of water, would you take the water when you could get it? A. Yes."

P. N. Marker, the former owner of the Rodgers land, testified:

"Q. Is there any fixed time when the first crop is cut? A. No, sir; that also depends on the season; it varies sometimes two weeks. Q. So, as a matter of fact, there is no fixed period of irrigation of that property out there? A. Well, yes; there is a certain time between February and September."

Joseph Hill, superintendent of the Rodgers ranch, on cross-examination testified:

"Q. Do you mean during the irrigating season, running through the entire irrigating season? A. Yes. Q. What is the irrigating season? A. When you need it. Q. How many months? A. From February until September."

Peter Anker testified that the irrigating season in Lovelock Valley "would be all the way from the first of March, or last of February, to the first of September."

W. C. Pitt, one of the defendants, testified, that alfalfa required irrigation "in April or March as the case may be. * * * I have irrigated at all times through the winter when I could get water; that is, in places where I could put the water, where it would not injure the land. The regular time that I am using water to irrigate with is about the 1st of March at the present time."

4. It is claimed by counsel that, "to establish an appropriation of water, the proof must show intent to apply it to a beneficial purpose

existing at the time, an actual diversion from the stream, and the application of it to a useful purpose." This is correct. In Union Mill & Mining Co. v. Dangberg, supra, this court, in discussing principles applicable to this case, said:

"Under the principles of prior appropriation, the law is well settled that the right to water flowing in the public streams may be acquired by an actual appropriation of the water for a beneficial use; that, if it is used for irrigation, the appropriator is only entitled to the amount of water that is necessary to irrigate his land, by making a reasonable use of the water; that the object had in view at the time of the appropriation and diversion of the water is to be considered in connection with the extent and right of appropriation; that if the capacity of the flume, ditch, canal, or other aqueduct by means of which the water is conducted, is of greater capacity than is necessary to irrigate the lands of the appropriator, he will be restricted to the quantity of water needed for the purposes of irrigation, for watering his stock, and for domestic use; that the same rule applies to an appropriation made for any other beneficial use or purpose; that no person can, by virtue of his appropriation, acquire a right to any more water than is necessary for the purpose of his appropriation; that, if the water is used for the purpose of irrigating lands owned by the appropriator, the right is not confined to the amount of water used at the time the appropriation is made; that the appropriator is entitled, not only to his needs and necessities at that time, but to such other and further amount of water, within the capacity of his ditch, as would be required for the future improvement and extended cultivation of his lands, if the right is otherwise kept up; that the intention of the appropriator, his object and purpose in making the appropriation, his acts and conduct in regard thereto, the quantity and character of land owned by him, his necessities, ability, and surroundings, must be considered by the courts, in connection with the extent of his actual appropriation and use, in determining and defining his rights; that the mere act of commencing the construction of a ditch, with the avowed intention of appropriating a given quantity of water from a stream, gives no right to the water unless this purpose and intention are carried out by the reasonable, diligent, and effectual prosecution of the work to the final completion of the ditch, and diversion of the water to some beneficial use; that the rights acquired by the appropriator must be exercised with reference to the general condition of the country and the necessities of the community, and measured in its extent by the actual needs of the particular purpose for which the appropriation is made, and not for the purpose of obtaining a monopoly of the water, so as to prevent its use for a beneficial purpose by other persons; that the diversion of the water ripens into a valid appropriation only where it is utilized by the appropriator for a beneficial use. * * * Water in this state is too scarce, needful, and precious for irrigation and other purposes to admit of waste. No person, whether an appropriator or riparian proprietor, should be allowed to 'be extravagantly prodigal in dealing with this peculiar bounty of nature.'"

5. The questions stated by counsel in points 5 to 11 will be grouped together under one general head.

(a) The claim that "Hauskins' appropriation antedated that of Marker" is not supported by the testimony. The answer of defendants does not contain any allegation claiming any rights whatever under the appropriation made by Hauskins in 1873; it admits priority in complainant to the extent of 450 inches. It is without foundation in the pleadings or the proofs, and is not seriously urged. In fact, it appears to have been made subject to conditions which have no special application to the particular facts of this case. The facts as shown by the evidence at the trial, as well as upon the hearing, are that "the defendants' right to appropriate any water from the Humboldt river was not acquired until the fall of 1888. Complainant's

rights, as well as those of Thies and Carpenter, his co-tenants in the Marker ditch, were acquired many years prior to that time." 89 Fed. 423. Marker's claim and rights to the water commenced in 1875.

(b) Did complainant's predecessors in interest prosecute the work with such reasonable diligence as to entitle him to claim his rights by relation to the time of their first inception? The principles of law applicable to this question are covered by the quotation from Union M. & M. Co. v. Dangberg, supra. Whether this case comes within the rules there stated is a question of fact. The court must always be controlled by the facts, circumstances, and conditions as shown by the evidence. An illustration is found in the decisions of the Supreme Court of this state. Thus, in the Ophir Silver M. Co. v. Carpenter, 4 Nev. 534, 97 Am. Dec. 550, it was held that the diligence required by the law was not established by the facts. And in Barnes v. Sabron, 10 Nev. 217, 242, it was held that proper diligence was shown. But the principles of law announced in each were the same, and are substantially identical with the doctrine announced by this court in the case of Union M. & M. Co. v. Dangberg, heretofore quoted. "What constitutes a reasonable time within which the water must be applied to beneficial use is obviously a question of fact, depending upon the circumstances of each particular case." Long on Irrigation, § 47, and authorities there cited.

(c) In the course of defendants' brief it is said:

"An examination of the record will disclose the fact that, as to all save an exceedingly small part of the Marker diversion, each of the three elements essential to constitute a valid appropriation was utterly lacking when the water was first taken. There was no present intention to apply it to a useful purpose. There was no necessity for the water. There was no application of it to a beneficial use. As to the first element, the larger and more valuable portion of the Marker ranch—that part which is now under cultivation was under water—was swamp. There certainly could have been no intention to use water on swamp lands. As to the second element, there was—there could have been—no necessity to irrigate the swamps. As to the third element, no such application, if claimed or intended, could have been beneficially made."

The fact is that, at the time Marker secured the lands and appropriated the waters of the Humboldt river, the natural waters thereof were flowing in the Humboldt river, and spread over portions of the lands in various sloughs. It was necessary to drain these sloughs in order to put the land under cultivation. It was like cutting timber in the forests, or digging out or plowing up the sagebrush or greasewood that grows in the desert. The conditions on the land had to be changed in order to apply the water claimed and appropriated to a useful and beneficial purpose. It was a part of the enterprise which Marker had in view in making his appropriation. There is no principle of law that required him, under such circumstances, to delay making his appropriation until after he succeeded in draining the land and putting it in a condition where it could be cultivated. The defendants are not in a position to make any such defense. They did not make any appropriation of the waters of the river until years after Marker had appropriated the same, and had cleared nearly all of his land for cultivation, and was irrigating the same, using the water he had appropriated for a useful and beneficial purpose. All

that they can claim is as to the excess of the water after the time they made their appropriation in the year 1888. They were not entitled to any vested right to any of the waters of Humboldt river until that time. To hold otherwise would be to take away from complainant, whose predecessors in interest had made a prior appropriation and diverted the water to a beneficial use, the quantity of water to which he was entitled, and give to the defendants a quantity of water to which they never were entitled, and had never theretofore enjoyed, or had the right to enjoy.

(d) There was no lack of diligence upon the part of complainant, or his predecessors in interest, after the years 1888 and 1889. It is true that during certain years thereafter the complainant did not use as much water as had been used before 1888, and some reliance seems to be placed upon this fact in order to reduce the amount of water to which complainant is entitled. During the dry years there was not sufficient water to furnish the necessary supply. Complainant could not obtain sufficient water to irrigate the land. The complainant certainly ought not to be confined to the amount of water he used, and to the number of acres irrigated during the dry seasons. A reference to the statement of facts will show the number of acres cultivated on complainant's land in grain and alfalfa, and the number of acres plowed for which water could not be obtained during the years 1896, 1897, and 1898. Looking further into the facts, it will be discovered that, after the defendants had diverted the water of the river onto their lands, their acreage steadily increased year by year until they had about 4,000 acres under cultivation. In the estimates made by defendants of the number of acres under cultivation on complainant's land, they apparently overlook the plowed ground, and ignore the number of acres of pasture land or wild grass that were irrigated. It is in effect claimed that the use of water for pasture and for wild hay was not for a beneficial purpose. The courts have held otherwise. In Pyke v. Burnside (Idaho) 69 Pac. 477, it was expressly held that where one constructs a ditch and conducts water upon his land year after year, and permits the same to spread out over wild hay land for the purpose of making hay or using such land for pasture, he thereby secures the right to the use of sufficient water to irrigate such land, provided the amount of water so used is sufficient for that purpose; such use being a beneficial one. In Smyth v. Neal, 31 Or. 105, 109, 49 Pac. 850, 851, the court said:

"It seems to have been a conceded proposition that the use of water for the irrigation of these wild meadow lands was for a useful purpose, and that such irrigation was necessary for the production of grass in sufficient quantities to be gathered and cured as feed for stock."

The theory advanced by defendants, that the rights of complainant should be limited to the amount of lands actually cultivated for crops and grain, cannot be sustained. In Kleinschmidt v. Greiser, 14 Mont. 484, 497, 37 Pac. 5, 6, 43 Am. St. Rep. 652, the court, in answering a similar contention, said:

"Such theory, if followed, is, we think, without doubt, erroneous. Thereby a prior appropriator of water would be cut down to the quantity necessary to irrigate the land he actually had under cultivation when the subsequent

appropriation was made, although the first appropriator's land was all available for production of crops by aid of irrigation, but, at the time of making the appropriation of water necessary for its irrigation, he had not subdued all of it to the plow. The priority under such rule would depend largely upon the time appropriators brought their lands under cultivation, and not upon the priority of appropriation and diversion of the water necessary to irrigate the land owned by the appropriator, as the law provides."

6. What amount of water is complainant entitled to in this case? What amount of water is necessary to properly irrigate an acre of land? These questions were involved and disposed of on the preliminary hearing (89 Fed. 423), and must now be disposed of by the weight of the testimony given upon the trial of the case. No additional facts were elicited at the trial which demand any change in the views that were then expressed. The amount of water necessary to irrigate the lands depends, in a greater or less degree, upon the general character of the soil in the locality where the lands are situated. The system in vogue among the farmers in Lovelock Valley is that of using irrigating ditches, generally of uniform size and dimensions, varied only by changed conditions, and turning the water through these ditches over the land, controlling and changing the water, as occasion requires, at different times during the day, and letting it run and take care of itself during the night, but arranged where it is believed it will do the most good and least harm. Upon the preliminary hearing it was said: "It is the duty of the court, in the absence of any law upon the subject, to determine the amount of water by a reference to the system used." This necessarily implied that the system was a proper one under all the existing conditions. In Long on Irrigation, § 49, the author said:

"The methods of applying water to the soil vary with the character of the soil and crop, the quantity of water available, the slope of the ground, and like considerations. The water may be distributed, as is usually done in the case of hay crops, such as alfalfa, growing on nearly level ground, by cutting the side of the distributing ditch constructed along the highest parts of the field, either by making temporary openings with a shovel or hoe, or by permanent gates, and letting the water flow in all directions over the surface. This is evidently the simplest mode of distribution from a ditch. Other methods, varying in complexity up to elaborate systems of distribution by means of pipes, are employed."

The defendants' expert Taylor testified that in his opinion the system of irrigation used by the farmers in Lovelock Valley is defective, but nevertheless "it is arranged according to the best intelligence of the farmers themselves, and oftentimes very good, still apt to be defective more or less."

Absolute perfection in the system of irrigation in this state, has, perhaps, not yet been reached, and it is doubtful if any system could be devised that would not, in the opinion of some scientists and experts, "be defective more or less." The contention that the prior appropriators of the water ought to be compelled to change their system for the exclusive benefit of the subsequent appropriators, who use the same system, does not appeal, in the light of all the facts in this case, very forcibly to a court of equity, as being sound. It would seem more just to allow the complainant to change his system, if he can and desires so to do, and to adopt any system that would allow

him to so use the amount of water to which he is entitled as would enable him to cultivate more of his land. The court cannot, in the absence of any law upon the subject, compel the farmers to use any particular system, but it might, in a case where an extravagant and wasteful system is used, which demands more water than they are entitled to by virtue of their appropriations, declare that under such circumstances they were not entitled to the quantity of water they were using, and give the excess to subsequent appropriators. But this is not such a case. The testimony shows that the system referred to is used by all the farmers in Lovelock Valley—by the defendants as well as by the complainant.

In the former opinion, speaking of the testimony, the court said:

"The witnesses on behalf of complainant place the quantity at one inch to the acre; the defendants generally at about one-half an inch to the acre; some placing it, however, as low as one-quarter of an inch to the acre. The great weight of the testimony, however, is to the effect that one inch to the acre is required to properly irrigate the cultivated lands. The defendants offered testimony to the effect that they would be satisfied with one-half an inch to the acre, and that that quantity was all that was required. The fact, however, is that, during the early part of this season, all the farmers taking water from the Pitt ditch used 3,400 inches of water to irrigate about 3,000 acres of land, and there were more or less dissensions between them as to their not having their proportion or sufficient quantity of water to properly irrigate their lands. A surveyor was employed, and measurements made, showing, with but one or two exceptions, that each party was only using his proportionate share of the water," to wit, one inch to the acre.

The only additional testimony at the trial was given by experts, whose testimony is claimed by defendants to be entitled to greater credit than the testimony of the farmers. It is an easy task for counsel to claim that the witnesses introduced on behalf of their clients establish facts which entitle them to recover, but the court ought not to ignore the testimony of the other side. It is compelled to consider all the testimony offered by the respective parties, to weigh and analyze it by the settled rules of law, in order to determine where the preponderance lies. In its investigation the court cannot say that the testimony of experts as to the amount of water used or required must be accepted as against the farmers of the vicinage who had been living in the valley and using the water for several years. It may be difficult for the courts to determine with mathematical certainty the precise amount of water running in a stream, or the carrying capacity of ditches and flumes, when the testimony, as in the present case, is conflicting; but the experts, who ought to know, differ as widely in their measurements as do the ordinary farmers in their method of calculation. A reference to what was said by this court in Union Mill & Mining Co. v. Dangberg, 81 Fed. 99, 100, without comment, shows that even experts are liable to make mistakes in their methods of measuring water, and in their judgment as to the amount of water necessary to irrigate an acre of land.

There are divers other points argued by defendants' counsel, not specifically noticed herein. Their discussion would serve no useful purpose. Suffice it to say that in my opinion, after a careful examination thereof, they are not of such a character as to change the results. Many of the points urged by defendants' counsel seem to

have been made, as was said by the court in Francis v. United States, 188 U. S. 376, 23 Sup. Ct. 334, 47 L. Ed. 508, "in the hope that some shot might hit the mark."

Upon the whole case, my conclusion is that the complainant herein is entitled to a decree that the temporary injunction heretofore issued be made perpetual, restraining defendants and all parties claiming under them, their agents, servants, employés, etc., from diverting, or in any manner using, the waters of the Humboldt river so as to prevent 3,500 inches thereof, measured under a four-inch pressure (or, in other words, 70 cubic feet of water per second of time), from flowing in the bed of the river to the head of complainant's ditch during the irrigating season, and for costs.