McFARLAND et al. v. ALASKA PERSEVERANCE MINING CO.

(First Division.   Juneau.   June 3, 1907.)

No. 510A.

**1. WATERS AND WATER COURSES (§ 40*)—RIPARIAN RIGHTS.**

Within the territory occupied by the public lands, where the opposite banks of any stream not navigable belong to different persons, the stream and the bed thereof shall become common property (section 2476, Rev. St. U. S. 1878 [U. S. Comp. St. 1901, p. 1567]); otherwise there is no national law of riparian rights. These are fixed, measured, and governed by the local law.

[Ed. Note.—For other cases, see Waters and Water Courses, Dec. Dig. § 40.*]

**2. STATUTES (§ 231*)—CONSTRUCTION.**

Courts may consider the whole of a statute, or a series of amending statutes, the titles of the several acts and their general scope and purpose, a legislative classification thereof in a revised edition, and the titles, headings, and marginal notes in such legislative revision, in determining the intention of the Legislature in a subsequent statute adopting parts or the whole of such former statutes.

[Ed. Note.—For other cases, see Statutes, Cent. Dig. §§ 288, 312; Dec. Dig. § 231.*]

**3. TERRITORIES (§ 8*)—ALASKA—STATUTES OF UNITED STATES EXTENDED.**

Alaska is, and since the approval of the act of Congress of May 17, 1884, entitled "An act providing a civil government for Alaska" (23 Stat. 24, c. 53), has been, one of the organized territories of the United States. *Held*, that the Constitution and all laws of the United States which are not locally inapplicable, including section 2339, Rev. St. U. S. 1878 (U. S. Comp. St. 1901, p. 1437), were then extended to Alaska by section 1891.

[Ed. Note.—For other cases, see Territories, Cent. Dig. § 5; Dec. Dig. § 8.*]

---

*See same topic & § NUMBER in Dec. & Am. Digs. Key No. Series & Rep'r Indexes

4. WATERS AND WATER COURSES (§ 34*)—RIPARIAN RIGHTS—COMMON
LAW.

There is no local statute establishing riparian rights upon non-
navigable streams in Alaska. It is a common law right, if it
exists.

[Ed. Note.—For other cases, see Waters and Water Courses,
Cent. Dig. §§ 27, 28; Dec. Dig. § 34.*]

5. COMMON LAW (§ 11*)—IN FORCE IN ALASKA.

The common law of England is in force in Alaska only so far
as its principles are applicable and are suited to the conditions
of the country and the necessities of the people, and not re-
pugnant to our laws or to the established customs and usages of
the people of the territory.

[Ed. Note.—For other cases, see Common Law, Cent. Dig. §§
9–12; Dec. Dig. § 11.*]

6. WATERS AND WATER COURSES (§ 45*)—MINES AND MINERALS.

The plaintiffs located a placer mining claim crossed by a non-
navigable stream. They brought suit to enjoin the diversion of
the water of the stream above them for mining purposes, claim-
ing the right to a full continued flow of the stream as a riparian
right, without necessity of an appropriation for beneficial use.
Held, that such claim of riparian right was in direct conflict
with the provisions of the United States water law (section 2339,
Rev St. U. S. 1878 [U. S. Comp. St. 1901, p. 1437]), and also with
the established miners' customs, rules, regulations, and usages in
Alaska, and destructive thereof; that the mere location of a
placer mine crossed by a nonnavigable stream, in Alaska, does
not vest the locator with such riparian ownership in the waters
as to compel a court of equity to enjoin their subsequent appro-
priation and diversion for mining purposes.

[Ed. Note.—For other cases, see Waters and Water Courses,
Dec. Dig. § 45.*]

7. WATERS AND WATER COURSES (§ 12*)—APPROPRIATION.

To constitute a valid appropriation of water three elements
must always exist: First, an intent to apply it to some beneficial
use, existing at the time, or contemplated in the future; second,

*See same topic & § NUMBER in Dec. & Am. Digs. Key No. Series & Rep'r Indexes

a diversion from the natural channel by means of a ditch, canal, or other structure; and, third, an application of it within a reasonable time to some useful purpose.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. §§ 5–9; Dec. Dig. § 12.*]

8. WATERS AND WATER COURSES (§ 85*)—DIVERSION—INJUNCTION—DEFENSES.

Plaintiffs sought to enjoin diversion of water from a nonnavigable stream flowing across their placer mine. The greater part of the area of the mine was in conflict with a prior claim belonging to the defendants. Its value was shown to be nominal. No loss or damage was shown. The equities were with defendants. *Held*, that an injunction ought not to be issued.

[Ed. Note.—For other cases, see Waters and Water Courses, Dec. Dig. § 85.*]

This is a suit in equity to restrain the defendant from diverting for mining purposes the waters naturally flowing in a nonnavigable stream across a placer mining claim belonging to the plaintiffs, and for damages.

In October, 1880, the miners in the near vicinity of the present site of Juneau, Alaska, discovered gold in the Silver Bow basin, where the property in litigation in this case is situated. They called miners' meetings, organized the Harris mining district embracing such basin, adopted rules and regulations governing the location and size of and rights in mineral claims, elected a local recorder, and instituted a miners' form of government where none had previously existed. At a subsequent meeting held on February 18, 1882, the miners adopted additional rules and regulations governing the appropriation and diversion of water from streams for mining and other beneficial uses.

So much of the rules and regulations governing the appropriation and use of water as is important is as follows:

*See same topic & § NUMBER in Dec. & Am. Digs. Key No. Series & Rep'r Indexes

"Article 1. The right to use the running water flowing in a river or stream, or down a canyon or ravine, may be acquired by appropriation.

"Art. 2. The appropriation must be for some useful or beneficial purpose, and when the appropriator or his successor in interest ceases to use it for such purposes, the right ceases.

"Art. 3. The person entitled to the use may change the place of diversion, if others are not injured by such change, and may extend the ditch, flume, pipe or aqueduct by which the diversion is made to take place beyond that where the first use was made.

"Art. 4. A water appropriation may be turned into the channel of another stream and mingled with its waters and then reclaimed, but in reclaiming it the water already appropriated by another must not be diminished.

"Art. 5. As between appropriators, the one first in time is the first in right.

"Art. 6. A person desiring to appropriate water must post a notice in writing, in a conspicuous place at the point of intended diversion, stating therein: First, he claims the water there flowing to the extent of [giving the number] inches, measured under a six-inch pressure; second, the purpose for which he claims it, and the place of intended use. A copy of the notice must within (10) ten days after it is posted be recorded in the books kept by the recorder of the district.

"Art. 7. Within twenty days, during the working season, after the notice is posted, the claimant must commence the excavation or construction of the works in which he intends to divert the water, and must·prosecute the work diligently and uninterruptedly to completion, unless temporarily interrupted by rain or snow.

"Art. 8. By completion is meant conducting the waters to the place of intended use.

"Art. 9. By a compliance with the above rules the claimant's right to the use of the water relates back to the time the notice was posted.

"Art. 10. A failure to comply with such rules deprives the claimant of the right to the use of the water as against a subsequent claimant who complies therewith."

Plaintiff's Exhibit No. 16.

On July 2, 1897, defendant's grantor, Joseph T. Gilbert, posted the following notice of right of way and water right at

the old dam on Lurvey creek, Silver Bow basin, Harris mining district, near Juneau, Alaska.

"Notice of Location.

"Pre-emption of Right of Way for Ditch, Flume, and Pipe, and Location of Water.

"To whom these presents may concern: Know ye, that I, Joseph T. Gilbert, of Milwaukee, Wisconsin, a citizen of the U. S., do hereby declare and publish as a legal notice to all the world that I claim and have a valid right to the occupation, possession, and enjoyment of all and singular that tract or parcel of land lying and being in the Harris mining district, district of Alaska, for the exclusive right of way, for the purpose of constructing a ditch, flume, or pipe line, from Lurvey creek to the Perseverance mill site, U. S. survey No. 68B, more particularly described as follows, to wit: Commencing at this notice and monument, the same being erected at a dam in said creek, and running thence to the head of the pipe line; thence by pipe N. 3° 30′ W. 1,400 linear feet horizontal measurement to the said mill site. I also claim and have a valid right to 4,000 miners' inches of water from said creek for mining purposes, to be conveyed through said ditch and pipe line to said mill site.

"Joseph T. Gilbert,
"By Chas. W. Garside, Agent.
"Notice posted on the ground this 2d day of July, 1897."

The notice was filed and recorded in the office of the commissioner and ex officio recorder on July 6, 1897, at page 199 of Book 5.

As early as 1889 United States patents issued to W. A. Sanders for the following lode mining claims, to wit: Perseverance, Alta, and Jumbo. See Defendant's Exhibit No. 8. In 1892 other claims were located by Sanders' grantees, and in 1896 Gilbert purchased the mining property then including the Perseverance, Alta, Jumbo, and Rimrock mining claims, and the Rimrock, Ajax, and Alta mill sites with buildings, pipe lines, and water rights. In January, 1897, United States patent issued to Gilbert for the Rimrock lode claim and the Ajax,

Rimrock, and Alta mill sites; and in June, 1897, he located the adjoining lode claims, Perseverance No. 2, Alta No. 2, and Jumbo No. 2. At this time he was also prosecuting work on tunnels on the patented claims to prospect the ore bodies. On July 2, 1897, he located the waters of Lurvey creek, caused the waters to be diverted at the old dam, carried them from their original bed, and spilled them over the mountain side above the point where the boarding house and blacksmith shop were built and the tunnel and other excavations were to be made. In 1897 Wm. Nelson, for Gilbert and at his expense, expended $301.58 for labor and material in extending and repairing the ditch between the point of diversion and the spillway. Exhibit 38. In 1898 C. H. Pearce, superintendent for Gilbert, expended $399.65 in improving the ditch and making it sufficient to supply the works below the spillway. Exhibit No. 39. Gorman put in a dam for Gilbert at the intake on Lurvey creek in 1899. In 1901 Gilbert sold his holdings to the Perseverance group of mines to W. J. Sutherland, who assigned his contract to the newly organized Alaska Perseverance Mining Company. On November 2, 1901, United States patent issued to Gilbert for lode mining claims Perseverance No. 2, Alta No. 2, Jumbo No. 2, and Perseverance No. 2 mill site. On April 22, 1902, Gilbert made deed to the Alaska Perseverance Mining Company of the Lurvey and Gold creek water rights. Exhibit No. 26. On September 17, 1903, Gilbert made his deed of the Perseverance group of mines, patented and unpatented, to the Alaska Perseverance Mining Company, which had prior thereto been prospecting the mines under contract or option of purchase. In 1903 the water from Lurvey creek was conveyed into the blacksmith shop, the boarding house, and down the air shaft of the Alexander tunnel for ventilating purposes.

Lurvey creek falls down the mountain side into Gold creek over a series of cascades. The Perseverance, Alta, and Jumbo

group lies high up on the mountain, and Lurvey creek crosses them in its tumble to the valley below. The mill sites—the Ajax, Rimrock, Alta, and Perseverance—lie in a group at the bottom of the valley where Lurvey creek comes down into Gold creek. The Alexander tunnel was driven from a point a few hundred feet above the mill sites into the mountain, and pierced the ore bodies in the Perseverance group far below their apex on the mountain, and about 2,500 feet from the portal of the tunnel. This tunnel was completed in 1904.

Early in 1905 the work on the completion of the plan of operations at the Perseverance group was begun. Grading for new boarding house, crusher, and mill was under way, and diligent work was actually in progress upon the whole scheme of erecting the reduction works for mining the ore out of the numerous patented lode claims through the Alexander tunnel. The pipe line was surveyed and being excavated, and a large force of men was busily engaged in completing the buildings for the stamp mill. The contracts had been let to the Hendy Company for the erection of the mills, the installing of the pipe line to carry the waters diverted from Lurvey creek by Gilbert, and the final consummation of years of work on the plant was at hand and diligently pursued.

While this condition on the part of the defendant's efforts existed, and on June 19, 1905, the B. C. fractional placer mine, was located by the plaintiff V. McFarland. Thereafter, and on August 26, 1905, McFarland filed and caused to be recorded his notice of appropriation of the waters of Lurvey creek at a point below the Perseverance intake and diversion. The McFarland notice is as follows:

"Notice of Appropriation of Water.

"Notice is hereby given that the undersigned did, on July 24, 1905, locate, appropriate, and claim one thousand (1,000) miners' inches of

water of Lurvey creek, in Silver Bow basin, in Harris mining district, Alaska, at the point where this notice is posted, which water is intended for use in mining and milling, and especially for use on the B. C. fraction placer, through which Lurvey creek runs at said point of diversion aforesaid. The said water is to be diverted and conveyed by means of a dam and flume or pipe line. Measured from the junction of Lurvey creek with Gold creek, the point of diversion whereon this notice has been posted as aforesaid, is about seven hundred (700) feet up the said creek in a southeasterly direction.

"Appropriator and claimant,

"V. McFarland.

"Witnesses:

"Frank D. Sheldon,

"J. W. Kelley."

At the time this claim was made and located, and on August 1, 1905, the excavations were finished for the crusher building, the mill building, and the material was on the ground for the erection of both, the pipe line to the flume line from Lurvey creek was located and excavated, the large new boarding house at the mouth of the Alexander tunnel was completed, and other buildings on the mill sites were up. See Plaintiff's Exhibit Nos. 24 and 28, and Defendant's Exhibit No. 40—photographs. The work was proceeding rapidly and with all the speed that a large force of men could give toward completion. The work of putting in new flumes from both forks of Lurvey creek was under way, and the waters from the Gilbert ditch were being used in the work, and were to be used in the pipe line then under actual construction in the operation of the crusher, compressor, and mill, all then in process of erection.

McFarland located the fractional B. C. placer claim on June 19, 1905. It was in part open public domain, but in the greater part it was in conflict with the prior Martin lode claim, located January 1, 1900. That claim was afterwards, and on August 7 and September 6, 1906, acquired by the

Alaska Perseverance Mining Company by deed from the orig-
inal locator and his grantees, Bach and Pollock. On August
26, 1905, after locating his water right on, and for use on,
the B. C. placer claim the plaintiff put in a small dam and a
flume, and turned the waters of Lurvey creek flowing across
his claim into the flume and thence into a miners' hose and dis-
charged it through a nozzle, and did some work ground-sluic-
ing on that portion of the B. C. placer within the overlap on
the Martin lode claim. The owners of the Martin claim
warned McFarland not to work on their claim. He did but
little work in ground-sluicing that year. In 1906 he attempted
to do more, but a contest was inaugurated by the Perseverance
Company against him; they claiming that his sluicing inter-
fered with their assessment work in sinking a shaft on the
Martin claim. McFarland brought into court as evidence less
than $10 worth of gold dust, which was all they obtained from
the work on the B. C. placer in 1905 and 1906. The evidence
showed that but little work was done on the B. C. placer in
1906, and that after the Martin lode assessment work was com-
pleted there was plenty of water on the B. C. placer; but Mc-
Farland did no more work that year. Plaintiffs conceded that
they would work but one-half to three-quarters of an acre of
their B. C. claim, outside of the Martin overlap, with the water
diverted, and the evidence did not show that any values existed
thereon in placer form.

The following map shows the relative location of the Per-
severance Company's patented and unpatented mining claims,
the mill sites, the course of Lurvey creek across the mining
claims, and the location of the B. C. placer claim, as well as
the Perseverance Company's flumes at the intake, the course of
their diversion and pipe line, the location of the diversion of
the plaintiff on the B. C. placer, and the place of the use
thereof on the overlap:

| | | | |
|---|---|---|---|
| A. | B. C. Placer Claim. | G. | Pipe Line. |
| B. | Martin Lode Claim. | H. | Alexander Tunnel. |
| C. | Main Lurvey Creek. | J. | Stamp Mill, Crusher, and |
| D. | Defendant's Intake. | | Compressor. |
| E. | Flume from East Lurvey. | K. | Gold Creek. |
| F. | Gilbert Ditch. | L. | Patented Claims on Summit. |

Plaintiffs filed their complaint on December 5, 1905. After the formal allegations of defendant's corporate character, the complaint alleges that on the 19th day of June, 1905, McFarland located the B. C. placer claim, describing it; that it was valuable placer ground, and that plaintiffs were competent locators; that at the time of locating the B. C. placer claim the Lurvey creek flowed over same, carrying from 600 to 1,000 miners' inches of water, and that at that time the waters of said creek were unappropriated for mining, propelling machinery, or any beneficial use, or at all; that on July 24, 1905, McFarland located same on the B. C. claim claiming 1,000 miners' inches and the complaint then contains his notice, herein above first copied; that on August 26, 1905, McFar-

land commenced the construction of a dam in the bed of Lur-
vey creek at the point of location and appropriation, and did
thereafter immediately and continuously construct the intake
and flume, and carry the waters over and upon the B. C. placer,
and began washing and mining thereon with said water; that
said waters were necessary in full volume for that purpose;
that all the plaintiffs are co-owners in both water and the B.
C. placer mining claim.

The complaint then alleges that, while the plaintiffs were
actually engaged in using the water for mining, the defendant
entered upon Lurvey creek at a point above the plaintiffs' di-
version and diverted the waters of said creek by means of
dams, flumes, ditches, and pipe lines, and dispossessed plain-
tiffs of its use, to their damage in the sum of $5,000. Plain-
tiffs pray for judgment for $5,000 money damages, and—

"that plaintiffs may be adjudged to be the owners by prior appropria-
tion and use of 1,000 miners' inches of the said waters of the said
Lurvey creek, and that they may be restored to the possession and
use of said waters, and may have such writs of assistance of posses-
sion against said defendant, so as they may be put in possession of
the flow of 1,000 miners' inches of water down the said waters of
Lurvey creek, from and by the point of diversion of the waters there-
of by the said defendant, and that the said defendant be prohibited
from the diverting of any of the said waters of said Lurvey creek
from their flow to the said placer claim under the said appropriation
of the plaintiffs, except such waters therein as are in excess of the
said 1,000 miners' inches."

Defendant answers, denying, and then alleges that on and
prior to July 2, 1897, Joseph T. Gilbert was a citizen of the
United States and the owner of six mining claims in Silver
Bow basin, upon the waters of Lurvey creek; that on that day
he located a water right and posted the notice hereinabove set
out, and recorded said notice on July 6, 1897; that said waters
and the whole thereof were located and are necessary for the
development and working of the mining claims; that the min-

ing claims and mill sites and water rights constitute one entire mining property, and the plan of development and working of the same contemplated the use of the water for the generation of power; that the water was to be and was used in the houses, building, and mills; that Gilbert began the construction of dams, flumes, and pipe line, and the erection of the necessary buildings to use said water; that Gilbert sold to the defendant, and that defendant entered into possession and has since continued diligently to develop the entire plant, and to erect works, build flumes, pipe lines, boarding houses, crusher mills, and other works for the application to beneficial use of the waters so diverted and claimed; that since 1897 the defendant and its grantors have continuously diverted and used the waters of Lurvey creek at a point above plaintiffs' diversion for such purposes; and defendant prays for confirmation of its title, and that plaintiffs be restrained from interfering with defendant's use of the water to the amount claimed.

The reply is a general denial.

G. C. Israel and J. A. Hellenthal, for plaintiffs.

F. M. Stone, R. F. Lafoon, Maloney & Cobb, and John R. Winn, for defendant.

WICKERSHAM, District Judge.  Plaintiffs pray for a decree enjoining defendant from diverting, above their intake, the waters of a nonnavigable stream flowing on the public domain, and thus destroying their alleged prior and better right to the use thereof in mining.  The defendant answers, asserting a prior and better right by a diversion and application to a beneficial use in mining long before that claimed by the plaintiffs.  The question at issue is:  Have the plaintiffs, or has the defendant, the better right to the use of the waters of Lurvey creek by prior diversion for mining?

1. The act of May 17, 1884, being an act entitled "An act providing a civil government for Alaska" (23 Stat. 24), pro-

vided for the organization of civil government in Alaska, the extension thereto of the laws of Oregon, and in section 8 enacted:

"And the laws of the United States relating to mining claims, and the rights incident thereto, shall, from and after the passage of this act, be in full force and effect in said district, under the administration thereof herein provided for subject to such regulations as may be made by the Secretary of the Interior, approved by the president."

Section 2319, Rev. St. U. S. 1878 (U. S. Comp. St. 1901, p. 1424), was thereby extended to Alaska. It provides that all valuable mineral deposits on lands belonging to the United States are open to exploration, occupation, and purchase by citizens of the United States—

"under regulations prescribed by law, and according to the local customs or rules of miners in the several mining districts, so far as the same are applicable and not inconsistent with the laws of the United States."

The sixteenth section of the act of June 6, 1900 (31 Stat. 328, c. 786), supplementing section 2324, Rev. St. 1878 (U. S. Comp. St. 1901, p. 1426), provides that:

"Miners in any organized mining district may make rules and regulations governing the recording of notices of location of mining claims, water rights, flumes, ditches, mill sites, and affidavits of labor, not in conflict with this act or the general laws of the United States."

All the rights of both parties in this case were acquired subsequent to the passage of the act of May 17, 1884, and it follows that so far as this case is concerned no miners' rule or regulation adopted by the miners in the Harris mining district in 1880, or at any other time, in conflict with the general laws of the United States, could have any legal force or effect after the approval of the act of May 17, 1884. A careful consideration of the evidence and the law relating to the miners' rules of the Harris mining district, other than those relating to water rights, so adopted in 1880 and contained in the first

series of ten articles in Plaintiffs' Exhibit No. 16, persuades me that they fell into utter disuse before the rights of either party hereto vested, were inapplicable and inconsistent with the general laws of the United States, and are therefore of no effect in the determination of the issues in this case.

2. The plaintiffs claim the right to the exclusive use of the whole of the waters naturally flowing in Lurvey creek upon two grounds: First, as the riparian proprietor thereof, by virtue of their location and ownership of the B. C. placer claim, through the uncontested portion of which the creek runs in a natural channel; and, second, by virtue of a prior appropriation thereof under the United States water law for mining purposes. Upon the undisputed evidence in support thereof the uncontested portion of plaintiffs' location of the B. C. placer claim, over which the waters of Lurvey creek naturally flow in its channel, constitutes a valid placer location under the mining laws of the United States. This location was made on June 19, 1905, and plaintiffs' claim of riparian rights dates from that time.

Within the territory occupied by the public lands, where the opposite banks of any stream not navigable belong to different persons, the stream and the bed thereof shall become common property. Section 2476, Rev. St. U. S. 1878. Otherwise there is no national law of riparian rights. These are fixed, measured, and governed by the local law. Packer v. Bird, 137 U. S. 661, 11 Sup. Ct. 210, 34 L. Ed. 819; Hardin v. Jordan, 140 U. S. 371, 11 Sup. Ct. 808, 838, 35 L. Ed. 428; Shively v. Bowlby, 152 U. S. 1, 14 Sup. Ct. 548, 38 L. Ed. 331; Waters and Water Rights, Farnham, vol. 1, p. 50.

No local statute has been cited which creates or recognizes riparian rights upon nonnavigable streams on the public domain in Alaska; but it is asserted that the right is one derived from the common law and the statutory adoption of the common law in Alaska is noted. Section 218 of the Penal Code of Alaska,

approved March 3, 1899, adopted the common law in the following terms:

"Sec. 218. The common law of England as adopted and understood in the United States shall be in force in said district, except as modified by this act."

Section 367 of the Civil Code, approved June 6, 1900, provided as follows:

"Sec. 367. So much of the common law as is applicable and not inconsistent with the Constitution of the United States or with any law passed or to be passed by the Congress is adopted and declared to be law within the district of Alaska."

Under these statutes one of the judges who formerly presided in this division, in the case of Ketchikan Water Co. v. Citizens' Water Co., 2 Alaska, 120, held that the United States water law was not extended to nor in force in Alaska, and that private titles to water in running streams on the public domain in this territory were to be adjudged upon the common-law rule of riparian rights:

"It may be said, and it is probably true, that section 2339 of the Revised Statutes of the United States (1878), concerning the vested rights to the use of water for mining, right of way for canals, etc., passed July 26, 1866, has not been put in force and is not in force in Alaska. This is not a part of the mining laws of the United States, but is an independent statute. * * *· Possibly the rights in water, therefore, and the use of the same, is restricted to what is known in the common law as 'riparian rights.' These depend upon the ownership of the land which is contiguous to and borders upon the water, and they do not attach to any lands, however near, which do not extend to the water. It is said 'that the rights of a riparian proprietor, so far as they relate to any natural stream, exist jura naturæ, because his land has by nature the advantage of being washed by the stream.' The right of the riparian proprietor is undoubtedly to have the flow of the stream across his premises in its natural state, the water being undiminished for any purpose." Ketchikan Co. v. Citizens' Co., 2 Alaska, 120.

It is important to the mining interests of Alaska to know whether that is a correct statement of the water law for this territory.   If the law of prior appropriation is not in force here, and the narrow rule of riparian ownership is the controlling and only law on that subject in Alaska, the defendant has no right to the waters of Lurvey creek, and the injunction should be granted.

3. But it is clearly an error to say that section 2339, Rev. St. U. S. 1878, is not one of the "laws of the United States relating to mining claims, and the rights incident thereto," and was, therefore, not extended to Alaska by the eighth section of the act of May 17, 1884.   It was originally enacted as section 9 of the lode and water law of July 26, 1866 (Act July 26, 1866, c. 262, 14 Stat. 251).   The title of that act was "An act to grant the right of way to ditch and canal owners through the public lands, and for other purposes," and Lindley says of it:

"The title gives no clue to the scope of the act.   As a matter of fact, the title belonged to another act which had passed the House, and for which the mining act was substituted in the Senate, without any attempt to change the title, and in this form passed both houses. It was the first general law passed under which title might be acquired to any of the public mineral lands within what are known as the precious metal bearing states and territories.   Section 53 (2d Ed.) Lindley on Mines.

And the Supreme Court of the United States, in Del Monte M. Co. v. Last Chance M. Co., 171 U. S. 55, 61, 62, 18 Sup. Ct. 895, 43 L. Ed. 72, says of this act:

"The statute of July 26, 1866 (14 Stat. 251, c. 262), was the first general statute providing for the conveyance of mines or minerals. * * *  The act of 1866 was, however, as we have said, the first general legislation in respect to the disposal of mines."

The act of July 26, 1866, was amended by the act of July 9, 1870, by the addition of sections 12, 13, 14, 15, 16, and 17

thereto. This amendatory act is known as the "Placer Law of July 9, 1870." Section 17 of this amendatory act provided:

"That none of the rights conferred by sections 5, 8, and 9 of the act of which this is amendatory shall be abrogated by this act; and the same are hereby extended to all public lands affected by this act." 16 Stat. p. 217, c. 235.

Section 9 being thus extended to all public lands affected by the United States placer laws, it must be held that, without further legislation, it was extended to Alaska with the placer law of 1870.

The general mining act of May 10, 1872, was entitled "An act to promote the development of the mining resources of the United States." 17 Stat. p. 91, c. 152. It contained amendments to both preceding acts, and new legislation upon the general subject of mining. Section 9 thereof repealed sections 1, 2, 3, 4, and 6 of the act of 1866, and made amendments to that act. Section 10 provided that the act of July 9, 1870, "shall be and remain in full force, except as to the proceedings to obtain patent," etc., thus affirming the extension of the water law with the placer laws to Alaska.

Upon the congressional codification of the statutes of the United States in 1878, section 9 of the act of 1866 became section 2339 in chapter 6, tit. 32, of the United States Revised Statutes of 1878. Now title 32 is headed "The Public Lands," and chapter 6 is headed "Mineral Lands and Mining Resources." The marginal note to section 2339 reads:

"Vested rights to use of water for mining, etc.; right of way for canals."

The lode and water law of July 26, 1866, including section 9 thereof, now section 2339, Rev. St. U. S. 1878, has been classified as and considered by the courts and law writers to be one of the mineral laws of the United States ever since its enactment. Section 2339 was so classified by titles, headings, and marginal notes in Rev. St. U. S. 1878.

Courts may consider the whole of a statute, or a series of amending statutes, the titles of the several acts, and their general scope and purpose, a legislative classification thereof in a revised edition, and the titles, headings, and marginal notes in such legislative revision, in determining the intention of the Legislature in a subsequent statute adopting parts or the whole of such former statutes. Holy Trinity Church v. United States, 143 U. S. 457, 12 Sup. Ct. 511, 36 L. Ed. 226; Knowlton v. Moore, 178 U. S. 65, 20 Sup. Ct. 747, 44 L. Ed. 969; Mackey v. Miller, 126 Fed. 161, 62 C. C. A. 139. Upon such consideration it is my judgment that section 2339 was one of "the laws of the United States relating to mining claims, and the rights incident thereto," extended to Alaska by the eighth section of the act of May 17, 1884. Not only is section 2339 found in the body of the mining acts passed by Congress, and classified therewith by statute, the courts and law writers, but, next to the right to mine on the public domain, it grants to miners the most valuable incident thereto—the right to use the public waters in mining. In its very essence it is one of the mineral laws of the United States, without which mining could not be made profitable.

The provisions of chapter 1 of the act of June 6, 1900 (31 Stat. 321), greatly strengthen that conclusion. That chapter provides for the reorganization of the territorial government of Alaska. Section 26 re-enacts that:

"The laws of the United States relating to mining claims, mineral locations, and rights incident thereto are hereby extended to the district of Alaska."

Section 13 provides that the district judges shall divide their respective districts into recording precincts, and appoint commissioners therein, who shall be ex officio recorders. Section 15 provides that:

"The respective recorders shall, upon the payment of the fees for the same prescribed by the Attorney General, record separately, in.

large and well-bound separate books, in fair hand: * * * Seventh. Notices and declarations of water rights." ·

Section 16, in its first proviso, enacts that:

"Miners in any organized mining district may make rules and regulations governing the recording of notices of location of mining claims, water rights, flumes, and ditches, mill sites, and affidavits of labor, not in conflict with this act or the general laws of the United States."

In compliance with these provisions the clerks of the court have provided recorders with separate books for recording "notices and declarations of water rights," and the same have been generally so recorded, and the fees therefor paid.

Prior to the passage of the act of 1884 extending the mineral laws to Alaska, the miners of the Harris mining district adopted rules governing the appropriation of the waters on the public lands for mining purposes, and ever since that act the miners throughout the various mining camps in Alaska have acted upon the accepted understanding that section 2339 was extended to and is in force in Alaska. Notices and declarations of water rights have been posted and recorded, the waters of public streams diverted and used for mining and other beneficial uses, and a large and rapidly growing wealth in mining has been created by the miners of the territory upon the faith of their right to appropriate the water of flowing streams for such purposes. The use of such public waters is one of the principal rights incident to mining, and, even if it be thought that section 2339 is not one of the laws "relating to mining claims," it undoubtedly establishes the principal "right incident thereto," and for that reason, also, was extended to Alaska by the eighth section of the act of May 17, 1884. Alaska is, and since the approval of the act of Congress of May 17, 1884, entitled "An act providing a civil government for Alaska" (23 Stat. 24), has been, one of the organized territories of the United States. Coquitlam v. U. S., 163 U.

S. 346, 16 Sup. Ct. 1117, 41 L. Ed. 184; Binns v. U. S., 194 U. S. 486, 24 Sup. Ct. 816, 48 L. Ed. 1087; Rassmussen v. U. S., 197 U. S. 516, 25 Sup. Ct. 514, 49 L. Ed. 862. Section 1891, Rev. St. U. S. 1878, provides:

"Sec. 1891. The Constitution and all laws of the United States which are not locally inapplicable shall have the same force and effect within all the organized territories and in every territory hereafter organized as elsewhere within the United States."

Therefore, in 1884, when Alaska was organized as a territory, "all laws of the United States which are not locally inapplicable" were extended to Alaska by force of section 1891, and this extended the law in question—section 2339, or the water law of the United States. It was not locally inapplicable, but was applicable to the conditions in Alaska, and necessary to work its mineral deposits.

Not only Congress and the miners of Alaska, but the courts thereof, have for many years acted upon the construction that Congress had extended section 2339 to Alaska. Noland v. Coon, 1 Alaska, 36; Revenue Min. Co. v. Balderston, 2 Alaska, 363; Miocene Ditch Co. v. Jacobson, 2 Alaska, 567; Miocene Ditch Co. v. Moore, Judge, 150 Fed. 483, 80 C. C. A. 301. Upon all these considerations it is my judgment that section 2339, Rev. St. U. S. 1878, was extended to Alaska by section 1891, Rev. St. U. S. 1878, and the eighth section of the act of May 17, 1884.

4. Plaintiffs' first claim to the waters of Lurvey creek is based upon their alleged riparian ownership in the waters of the creek as they naturally flow across their placer claim. That right depends upon the common law for expression. The unquestioned rule of the common law was that every riparian owner was entitled to the continued natural flow of the stream. United States v. Rio Grande Irrigation Co., 174 U. S. 690, 702, 19 Sup. Ct. 770, 43 L. Ed. 1136. Plaintiffs, therefore, claim that immediately upon the location of their valid placer

mining claim, through which the stream ran, they became entitled to the continued natural flow thereof without diminution or change, and without any act of appropriation or use on their part. Their contention is that the admitted fact that they had located a valid placer mine across which the stream naturally flowed prevented any one from appropriating the waters above them for mining, though plaintiffs had not appropriated them for any beneficial purpose. They put the question squarely: Shall riparian right, or appropriation for beneficial use, prevail in Alaska?

Alaska is one of the precious metal producing territories of the Pacific Coast. Its greatest natural wealth, present and future, lies in its mines, and there can be no successful development of that wealth without the right to appropriate and use the waters of its running streams for that purpose. The placers of Circle, Forty Mile, Fairbanks, Koyukuk, and Nome, the quartz mines of Treadwell, Silver Bow basin, and Chichagoff, the copper mines of Ketchikan, Prince William Sound, the Chitina, and the Nabesna, and the coal fields of Katalla, Matanuska, and the Nenana have called thousands of hardy prospectors and miners into the Alaskan mountains. For 30 years they have prospected and located mines, and located, diverted, and used the waters of the public streams in extracting that wealth—for mining, manufacturing, and for fisheries. These are matters of which this court will take judicial notice. Isaacs v. Barber, 10 Wash. 124, 38 Pac. 871, 30 L. R. A. 665, 45 Am. St. Rep. 772. Without filching from their neighbors, they have annually added many millions of wealth to the nation's purse, and not until this moment has the phantom of the common-law right of riparian ownership in those streams appeared to stay their progress.

Southeastern Alaska is a mountainous region, but little adapted to agriculture or stock raising. Next to mining, its greatest natural resource is its fisheries. These require the

use of its streams for the artificial and natural propagation of fish, and the full recognition and application of the riparian right would destroy that public and valuable use. It would also conflict with the right to use such waters for manufacturing and irrigation purposes, both of which uses are now more than ever before recognized in the West as necessary and beneficial rights of the public. It would, in effect, substitute for these great and necessary public uses the private and technical right of the riparian claimant to have the waters run without necessity or use. Without the common law of riparian ownership compels it, it is not the law in this territory that by the mere location of a placer mining claim across the waters of a nonnavigable stream on public lands, the upper waters thereof are thereafter forever required to flow in their natural channel across such claim, and cannot be diverted by others for beneficial use in mining, fisheries, manufacturing, or irrigation.

There is no local statute creating riparian rights upon nonnavigable streams on the public lands in Alaska. It is a common-law right, if it exists. Section 218 of the Penal Code adopted "the common law of England as adopted and understood in the United States," and section 367 of the Civil Code provides that:

"So much of the common law as is applicable and not inconsistent with the Constitution of the United States or with any law passed or to be passed by Congress is adopted and declared to be law within the district of Alaska."

Upon a prior careful consideration of the question this court has held:

"The common law of England then, is in force in Alaska only so far as its principles are applicable and are suited to the conditions of the country and the necessities of the people, and not repugnant to our laws or to the established customs and usages of the people of the territory." In re Burkell, 2 Alaska, 109, 119.

And this was the rule under the Oregon laws in force in Alaska prior to the adoption of the Alaska Civil Code by the act of June 6, 1900. Carson v. Gentner, 33 Or. 512, 515, 52 Pac. 506, 43 L. R. A. 130; and, generally, Luhrs v. Hancock, 181 U. S. 567, 21 Sup. Ct. 726, 45 L. Ed. 1005.

The riparian right claimed by the plaintiffs in this case is inapplicable and unsuited to the conditions in this territory. It is repugnant to and in direct conflict with the right of appropriation recognized by section 2339 as the common law of the mines. That statute was extended to Alaska in 1884. Defendant's right of prior appropriation is claimed to have vested in 1897, while the first act extending the common law to Alaska was approved March 3, 1899. Prior to all these dates the miners in the Harris mining district had established customs, rules, and regulations under which they diverted the waters on the public lands for mining purposes, and such customs, rules, and regulations continued and have been respected from that early time to the present. The riparian right claimed by the plaintiffs is in direct conflict with such customs, rules, regulations, and usages, and destructive thereof.

The present conditions in Alaska are similar to those in the early mining days of California, and the language of Mr. Justice Field in Jennison v. Kirk, in construing section 2339, is peculiarly applicable to the facts in this case:

"But the mines could not be worked without water. Without water the gold would remain forever buried in the earth or rock. To carry water to mining localities, when they were not on the banks of a stream or lake, became, therefore, an important and necessary business in carrying on mining. Here, also, the first appropriator of water to be conveyed to such location for mining or other beneficial purposes was recognized as having, to the extent of actual use, the better right. The doctrines of the common law respecting the rights of riparian owners were not considered as applicable, or only in a very limited degree, to the condition of miners in the mountains." Jennison v. Kirk, 98 U. S. 453, 458, 25 L. Ed. 240.

And in Atchison v. Peterson the Supreme Court said:

"By the custom which has obtained among miners in the Pacific states and territories, where mining for the precious metals is had on the public lands of the United States, the first appropriator of mines, whether in placers, veins, or lodes, or of waters in the streams on such lands for mining purposes, is held to have a better right than others to work the mines or use the waters. The first appropriator who subjects the property to use, or takes the necessary steps for that purpose, is regarded, except as against the government, as the source of title in all controversies relating to the property. As respects the use of water for mining purposes, the doctrines of the common law declaratory of the rights of riparian owners were, at an early day after the discovery of gold, found to be inapplicable, or applicable only in a very limited extent, to the necessities of miners, and inadequate to their protection. * * * But the government being the sole proprietor of all the public lands, whether bordering on streams or otherwise, there was no occasion for the application of the common-law doctrine of proprietorship with respect to the waters of those streams." Atchison v. Peterson, 87 U. S. 507, 510, 512, 22 L. Ed. 414.

The later decisions of the Supreme Court of the United States affirm the principles announced in the two last-cited cases. United States v. Rio Grande Irrigation Co., 174 U. S. 690, 704, 19 Sup. Ct. 770, 43 L. Ed. 1136; Gutierres v. Albuquerque Land Co., 188 U. S. 545, 553, 23 Sup. Ct. 338, 47 L. Ed. 588.

In those Pacific states and territories where the conditions of mining on the public lands most nearly resemble those in Alaska, the riparian right claimed by plaintiffs is denied. Boquillas Land Co. v. Curtis (Ariz.) 89 Pac. 504; Stowell v. Johnson, 7 Utah, 215, 26 Pac. 290; Crippen v. White, 28 Colo. 298, 64 Pac. 184; Coffin v. Left Hand Ditch Co., 6 Colo. 446; Reno Smelting Works v. Stevenson, 20 Nev. 269, 21 Pac. 317, 4 L. R. A. 60, 19 Am. St. Rep. 364; Willey v. Decker, 11 Wyo. 496, 73 Pac. 211, 100 Am. St. Rep. 939; Drake v. Earhart, 2 Idaho (Hasb.) 750, 23 Pac. 541; Montana: Atchison v. Peterson, 87

U. S. (20 Wall.) 507, 510, 22 L. Ed. 414; Basey v. Gallagher,.
87 U. S. (20 Wall.) 670, 681, 22 L. Ed. 452; New Mexico:
United States v. Rio Grande Irrig. Co., 9 N. M. 292, 51 Pac.
674, 677; Albuquerque Land Co. v. Gutierrez, 10 N. M. 177,
61 Pac. 357. The principal mining and arid states have abol-
ished the law of riparian right and embodied the recognition of
the public right to the use of waters in the streams by prior ap-
propriation by constitutional enactment. The states having
such constitutional provisions are Colorado, Wyoming, Idaho,
Montana, and North Dakota. 2 Farnham, Waters and Water
Rights, § 652a.

The mere location of a placer mine crossed by a nonnaviga-
ble stream, in Alaska, does not vest the locator with such ripa-
rian ownership in the waters as to compel a court of equity to
enjoin their subsequent appropriation and diversion for mining
purposes.

5. This conclusion leaves but the single question of priority
of right between plaintiffs and defendant, based upon their re-
spective appropriations of the waters of Lurvey creek, to be
determined. The plaintiffs' location of the B. C. placer claim
was made on June 19, 1905, their water right was located on
July 26th, and the notice filed and recorded on August 26th;
and their complaint alleges that on the latter date they began
work on the construction of their dam, and thereafter diverted
the water for use in mining the B. C. placer. These allegations
are practically admitted by the evidence and may be taken as
established in this case.

The defendant relies upon the Gilbert location of the waters
of Lurvey creek, made above the B. C. placer, on July 2, 1897,
and the diversion at that point, and the continued work on the
plant, and the final diversion in the summer of 1905. To these
claims the plaintiffs urge that defendant's diversion was not
prosecuted with due diligence, and cannot be legally related
back to the Gilbert notice and preliminary work.

The law of priority of appropriation upon which the parties in this case base their right to recover is the ninth section of the lode and water law of July 26, 1866, carried into the Revised Statutes of 1878 as section 2339, which reads as follows:

"Sec. 2339. Whenever, by priority of possession, rights to the use of water for mining, agricultural, manufacturing, or other purposes, have vested and accrued, and the same are recognized and acknowledged by the local customs, laws, and decisions of courts, the possessors and owners of such vested rights shall be maintained and protected in the same; and the right of way for the construction of ditches and canals for the purposes herein specified is acknowledged and confirmed; but whenever any person, in the construction of any ditch or canal, injures or damages the possession of any settler on the public domain the party committing such injury or damage shall be liable to the party injured for such injury or damage."

To constitute a valid appropriation of water three elements must always exist: First, an intent to apply it to some beneficial use, existing at the time, or contemplated in the future; second, a diversion from the natural channel by means of a ditch, canal, or other structure; and, third, an application of it within a reasonable time to some useful industry. Nevada Ditch Co. v. Bennett, 30 Or. 59, 87, 45 Pac. 472, 60 Am. St. Rep. 777, affirming same doctrine in Low v. Rizor, 25 Or. 557, 37 Pac. 82. In Oviatt v. Big Four Min. Co., 39 Or. 118, 126, 65 Pac. 811, the court held that an appropriator might use an old abandoned miners' ditch for the transportation of the water, and in Simmons v. Winters, 21 Or. 35, 27 Pac. 7, 28 Am. St. Rep. 727, the same court held that:

"To effect the appropriation, any gulch, dry ravine, or depression in the land may be used as a part of the ditch for conducting the water."

Judge Wolverton wrote the opinion in the case of Nevada Ditch Co. v. Bennett, supra, and the statement of the facts shows that in the early summer of 1881 persons claiming an appropriation of water from a public stream posted a notice at

the head of the proposed ditch, as required by local customs, stating the amount of water claimed, the purposes for which it was to be applied, and the route and terminals. Work was begun shortly afterwards, and a dam was built and a diversion made for the purpose of aiding in the excavation. The first section, two miles long, was completed in the spring of 1882. During 1882 the ground was cleared for the excavation of the second section to the further terminal. In the spring of 1883 the work was prosecuted till the irrigating season, when it was stopped to permit the use of water through the completed portion. It was resumed in the fall, and continued till the completion of the second section in the spring of 1884; and during that year water was run through the full length of the two sections—nine miles—and used for irrigation purposes. Held, that the claimants, who were pioneers, and of limited means and facilities, exercised due and reasonable diligence in the prosecution of the work.

Judge Ross wrote the opinion in Osgood v. Eldorado Min. Co., 56 Cal. 571. The statement of facts in that case shows that a survey was made for the ditch in 1856, and notices posted; surveyed lines run in 1858, and reservoir site located; in 1860 other surveys, a dam located, contracted for lumber, cleared intake, and posted notice of appropriation of Echo Lake as a reservoir, and portions of the ditch were then completed; in February, 1867, new notice of appropriation posted; in 1868 worked on lower end of canal; in 1870 on upper end; in 1871 completed dam at Cedar Rock, and turned water into canal. Thereafter from year to year the work was continued and completed in 1876, 20 years after it was first begun.

"In this case, the jury found in favor of the defendant on both propositions, and, as observed already, in view of the verdict, we think there is sufficient evidence of notice and of due diligence in the prosecution of the work from a date anterior to the acquiring of any rights by the plaintiff. We think, further, from the whole record,

that substantial justice has been done by the jury and the court below between the parties litigant."

The first appropriator who subjects the water to use, or takes the necessary steps for that purpose, is regarded, except as against the government, as the source of title in all controversies relating to the property. Atchison v. Peterson, 87 U. S. 507, 510, 22 L. Ed. 414; Basey v. Gallagher, 87 U. S. 670, 681, 22 L. Ed. 452. To constitute due diligence in diverting and appropriating water does not require unusual efforts or expenditures, but only such constancy in the pursuit of the undertaking as is usual with those in like enterprises; such assiduity as shows a bona fide intention to complete it within a reasonable time. Ophir S. M. Co. v. Carpenter, 4 Nev. 534, 97 Am. Dec. 550; Highland Ditch Co. v. Mumford, 5 Colo. 325, 2 Morr. Min. Rep. 3. In Oviatt v. Big Four Min. Co., 39 Or. 118, 126, 65 Pac. 811, 814, the court, discussing reasonable diligence, said:

"What constitutes such diligence must necessarily depend upon the nature and magnitude of the enterprise, and to some extent upon the organized effort put forth in accomplishing the desired object."

It is perhaps true that, in considering what would be reasonable diligence in marking out the line of a proposed ditch and commencing work on the same, a court would not be controlled by any arbitrary rule, but would consider the circumstances confronting an appropriator of water (Cruse v. McCauley [C. C.] 96 Fed. 369, 373); that the mere acts of commencing the construction of a ditch, with the avowed intention of appropriating a given quantity of water from a stream, gives no right to the water unless this purpose and intention are carried out by the reasonable, diligent, and effectual prosecution of the work to the final completion of the ditch and diversion of the water to some beneficial use (Union Mill & Min. Co. v. Dangberg [C. C.] 81 Fed. 73, 95).

What constitutes a reasonable time within which the water

must be applied to beneficial use is obviously a question of fact for the determination of the jury, or the court in equity cases, and depending upon the circumstances of each particular case. Long on Irrigation, § 47; Rodgers v. Pitt (C. C.) 129 Fed. 932, 941.

From time to time, as the appropriator completes parts of a planned enterprise for the beneficial use of water, the flow may be increased, provided that he act with reasonable diligence, that the flow shall not exceed the amount originally claimed, nor that which can be beneficially used, nor a greater quantity than the original ditch or flume would carry. Klienschmidt v. Greiser, 14 Mont. 484, 37 Pac. 5, 43 Am. St. Rep. 652; Cole v. Logan, 24 Or. 304, 33 Pac. 568; Rogers v. Pitt (C. C.) 129 Fed. 932, 942.

The ninth rule adopted by the miners in the Harris mining district on February 18, 1882, and which seems to be the law in principle, was as follows:

"Art. 9. By a compliance with the above rules, the claimant's right to the use of the water relates back to the time the notice is posted."

That rule states the law, even in the absence of a miners' rule or custom. In determining the question of the time when a right to water by appropriation commences, the law does not restrict the appropriator to the date of his use of the water, but, applying the doctrine of relation, fixes it as of the time when he begins his dam, or ditch, or flume, or other appliance by means of which the appropriation is effected, provided the enterprise is prosecuted with reasonable diligence. Mining Co. v. Carpenter, 4 Nev. 534, 544, 97 Am. Dec. 550; Irwin v. Strait, 18 Nev. 436, 4 Pac. 1215; Kimball v. Gearhart, 12 Cal. 28; Canal Co. v. Kidd, 37 Cal. 283, 311; Osgood v. Mining Co., 56 Cal. 571, 578; Sieber v. Frink, 7 Colo. 149, 154, 2 Pac. 901; Woolman v. Garringer, 1 Mont. 535; Kin. Irr. §§ 160, 161; Black's Pom. Water Rights, § 55; Union Mill Co. v. Dangberg (C. C.) 81 Fed. 73, 109.

6. The evidence in this case shows that Gilbert's notice of water right was posted on July 2, 1897, while that of plaintiffs was posted July 26, 1905. Gilbert sold out to the defendant corporation in 1901. Plaintiffs contend that upon the evidence there was an abandonment of the Gilbert location and all rights under it for want of due diligence in putting the water to a beneficial use in good faith. In considering that question the court will look at all the surrounding circumstances, the magnitude of the undertaking in which the water is to be used, the condition of the climate and the topography of the ground, the distance from supplies, the efforts to bring supplies, material, and machinery to the point of use, and, generally, the whole plan of the enterprise in which the water is to be utilized, as well as the good or bad faith of the claimant.

The question of reasonable diligence is a relative one. What might be reasonable diligence in one plan of operation, one scheme of using the water, might not be such in another. The court cannot lay down an arbitrary rule, since the law does not, and declare, because the limit in that case is not complied with, in this case there is also failure. It is certain that Gilbert initiated a valid claim to the water in 1897, and diverted and used some of it, and that diversion and use was continued from year to year until 1905. Defendant made full use in compliance with the law and previous intention. But plaintiffs say there was an abandonment because of the want of reasonable diligence. Abandonment is a question of intent, as well as of fact; and, when it is shown that possession has once attached, abandonment will not be presumed. Plaintiffs assert abandonment against the defendant, and under the Code must prove the affirmative of that issue.

The evidence, however, shows that in 1897, when Gilbert located this water, he owned several valuable quartz mines high on the mountain behind the water power; that his point

of diversion was between those claims and his mill sites in the valley below; that the waters of Lurvey creek tumbled down the mountain wall to the immediate vicinity of the mill sites, and was the only available supply in that neighborhood adapted by its location to his use in mills located on his mill sites; that his plan of development consisted in driving a tunnel in the mountain to tap the perpendicular veins of ore far below their apex on the summit, with the further plan of bringing the ore out through the tunnel to a point just beneath the water power and above the machinery for crushing and milling the ore, so that the ore could be worked and milled down grade on its way to the valley.

In pursuance to this general plan of development, a boarding house for the accommodation of laborers was built, a blacksmith shop, and other buildings. Tunnels were run high on the mountain, and later the main or Alexander tunnel was driven 2,550 feet through the mountain till it struck the main ore bodies far below the apex. Water was turned out of Lurvey creek at the point where the notice was posted, conducted in an old miners' ditch to a spillway, and turned over the mountain wall to find its way by a natural carving in the mountain side to a point near the boarding house, where it was piped into the boarding house, blacksmith shop, and into the first upraise of the Alexander tunnel for use in blasting. All these uses were beneficial, were necessary to the general plan, continuous, and in good faith. These uses were made as early as 1903, two years before plaintiffs made any claim to the use of the water. After defendant, in 1902, began to work on this property, it planned a pipe line to conduct all the waters of this small creek, which was located, as was supposed, entirely on its own property, to the compressor, crusher, and mill for power in running the heavy and expensive machinery which it was then preparing to install. Defendant continued, as rapidly as the general plan of the large

development in which it was engaged would permit, to bring the waters to its compressor, crusher, and mill. It excavated for a pipe line from the mill up the mountain slope to a point near the old spillway, where it prepared to receive the waters into the pipe, so as to give the necessary pressure at the mills. It excavated heavy cuts on the mill site for rock crusher, compressor, and mill, and ordered pipe sufficiently heavy and in quantity, lumber for new flumes from the intake on Lurvey creek, machinery for its mill, and generally continued actively, and with due diligence to prepare for the use of the water power in its crusher, compressor, and mill.

On July 26, 1905, plaintiffs' grantor located the waters of Lurvey creek, far below the intake of the defendant, for alleged use on the B. C. placer, which he had located on June 19, 1905. The condition of the defendant's works at that time is disclosed by a photograph offered in evidence by the plaintiff. Plaintiffs' Exhibits Nos. 24 and 28, and the same photograph offered by defendant as Defendant's Exhibit No. 40. These photographs were taken on or before August 1, 1905, while paragraph 5 of plaintiffs' complaint alleges, and the evidence sustains it, that plaintiffs' grantor's notice of the appropriation of the waters of Lurvey creek was filed for record on August 26, 1905—

"and that on said date the said V. McFarland did commence the construction of a dam in the bed of the said Lurvey creek at the point of location and appropriation aforesaid, and did thereafter immediately and continuously construct from said dam an intake and flume and carry the said waters over and upon the 'B. C. fractional placer claim,' and thereon construct flumes and sluices for the retention and collection of gold mined upon said placers, and erect upon said placers a hydraulic giant and pipe, and with said waters began the washing and mining of the said placer claim with the said waters."

A careful inspection of the said photograph discloses at that time on the property of the defendant the large boarding house near the dump from the Alexander tunnel, which;

was then completed 2,550 feet into the mountain, the excavations for the foundations of both the crusher and mill buildings, the presence on the ground of the material for these buildings, and the presence of the blacksmith shop, old boarding house, and other buildings, the excavation from the mill up the mountain side for the pipe line, and lumber and material for the new flumes at the intake. On August 1, 1905, when this photograph was made, plaintiffs had done nothing but locate the B. C. placer claim, and had made no attempt to locate or use the waters of Lurvey creek.

There is one general rule, good in equity and law, which is recognized by the mining laws of the United States and enforced by the courts, and that is this: That if the miner is in actual possession in good faith, and is actively engaged in the work of developing his possessory rights on the public land of the United States, no one may enter upon his peaceable and actual possession and oust him therefrom. Eilers v. Boatman, 3 Utah, 159, 2 Pac. 66, 15 Morr. Min. Rep. 462, affirmed in 111 U. S. 356, 4 Sup. Ct. 432, 28 L. Ed. 454; Price v. McIntosh, 1 Alaska, 286, 301, affirmed McIntosh v. Price, 121 Fed. 716, 718, 58 C. C. A. 136; Bulette v. Dodge, 2 Alaska, 427.

That rule is as applicable to possessory rights in water ditches for mining purposes as it is to other mining rights on the public domain. The Supreme Court of Colorado, in a case where this point came up, said:

"There is no reason for saying that the want of diligence in this case, upon the part of the Colony Company, was such as to prevent the appropriation of the water dating back to the commencement of the work, there being no intervening claimants." Highland Ditch Co. v. Mumford, 5 Colo. 325, 2 Morr. Min. Rep. 3, 13.

So that the rights of the parties are to be measured as of the date when the plaintiffs claim to have initiated their rights to the water, and the evidence shows that on that date the de-

fendant was in possession, and was actively and in good faith at work upon the final stages of a large development, taking years of time and a vast expenditure of money in its building and completion. It is my judgment that, when the plaintiffs attempted to locate the waters of Lurvey creek, the defendant had then in good faith located the same, and was using and had used due diligence in diverting and appropriating the whole thereof to beneficial uses, and was the owner and in possession thereof.

7. The plaintiffs bring this suit to enjoin the defendant from taking said waters, alleging their location thereof and intention to use the same for beneficial purposes. It appears from the pleadings and evidence that the only use the plaintiffs have for the water is to mine the B. C. fractional placer claim. This is a small wedge-shaped piece of ground lying within the general mass of defendant's claims. It is in conflict with the Martin quartz claim, a prior location. A suit is pending in this court between plaintiffs and defendant on an application of the defendant for patent for the Martin claim, adversed in the land office by the plaintiffs. Only a small part of the B. C. placer is the undisputed property of the plaintiffs, and less than an acre of the undisputed portion can be worked with the water in question. That small area is not shown to have any value as a placer mine; the whole labor of the plaintiffs so far having produced from it less than $10 worth of gold. The court in this case cannot try the questions of conflicting titles in the adverse suit upon this application for injunction; nor will a court of equity grant an injunction where the title is doubtful and in dispute between the parties, and no waste is shown, but will wait till the title is first settled between them. Beach on Injunctions, §§ 20, 998. Nor will the court grant an injunction where plaintiffs' rights are doubtful. Beach on Injunctions, § 21.

In this case the plaintiffs' right to the B. C. placer is in dispute in greater part. The portion not in conflict is not shown to have any value as mining ground. The evidence also leaves it an open question whether or not the plaintiffs are suffering any loss or damage, or can make any beneficial use of the waters in question. The evidence does not disclose any equity in plaintiffs' claims, but the reverse; for it appears to me to be an attempt to impose a technical claim upon these waters by which the plaintiffs would destroy the valuable property of the defendant, built as it was upon the faith of the water power from Lurvey creek. The ownership of the waters of Lurvey creek is a property right of far greater value to the defendant than the value of the B. C. fractional placer so far as the evidence discloses that it has any value. If plaintiffs succeed in securing the ownership of the water, they could thereby force the defendant to purchase the same for a sum far above any prospective value of their placer claim, because of the large investment which defendant has already made, depending upon the cheapness of the motive power in that water. That design seems to be the true issue in this case, and it does not commend itself to equity. Edwards v. Allouez Min. Co., 38 Mich. 46, 51, 31 Am. Rep. 301.

The defendant has shown due diligence in appropriating these waters, and, having appropriated them to beneficial use prior to any rights of the plaintiffs attaching, defendant's rights relate back to the inception of the grant by the government—to the original notice and diversion by Gilbert. The defendant's flumes from both branches of Lurvey creek were built, and the water appropriated—in good faith—from both, prior to any appropriation or diversion or claim thereof by the plaintiffs, and there must be a decree for defendant.

Let findings of fact, conclusions of law, and decree for defendant be prepared in accordance with these views.